MARJORIE GLEASON, APPELLEE, V. HERBERT D. BAACK,
APPELLANT.

289 N. W. 349

FILED DECEMBER 15, 1939.    No. 30669.

*Prince & Prince* and *Chambers, Holland & Locke,* for appellant.

*Joseph M. Emmert* and *Cleary, Suhr & Davis, contra.*

Heard before SIMMONS, C. J., EBERLY, PAINE, MESSMORE and JOHNSEN, JJ., and ELLIS, District Judge.

MESSMORE, J.

This is an action for personal injuries suffered by the plaintiff (appellee herein) in a collision upon the highway between the automobile in which she was riding and defendant's truck, which had temporarily stopped upon the highway. The cause was tried to a jury, and a verdict returned in favor of the plaintiff in the sum of $3,250. Motion for a new trial was overruled. Defendant appeals.

The record discloses the following facts: John Doherty,

the owner of a 1928 DeSoto coach automobile, was driving on the evening of November 28, 1937, from Greeley to Grand Island, Nebraska, accompanied by the plaintiff and four other companions. The party left Greeley at 7 o'clock. The plaintiff was returning to her duties at St. Francis Hospital in Grand Island. The radiator of the car leaked, and the driver had a can of water in the back of the car to replenish the radiator when needed. Between Greeley and St. Paul water was put into the radiator on two occasions. At St. Paul the party remained for an hour and a half to two hours at the Whale Café. After leaving St. Paul they delivered one member of the party at her home shortly before midnight, when plaintiff moved to the front seat of the car. The windshield was cleaned and water put in the radiator before the party entered highway No. 281. They proceeded south on the highway, an oil mat, 26 feet in width, with a white stripe down the center.

Floyd Hester, driving a G. M. C. truck, with an Omaha standard stock trailer attached, approached an intersection of highway No. 281 from the west. The width of the body of the trailer was 7 feet, 10 inches, and the height from the ground 11 feet. The trailer was loaded with 17 head of cattle, weighing 16,500 pounds, and the weight of the trailer was 13,800 pounds. The owner of the cattle, Henry Volke, was riding in the truck cab with the driver. Herbert D. Baack, the defendant, owner of the truck, and W. A. Munson were riding in an automobile following the truck. As the truck approached the intersection some of the cattle in the trailer were down, and the truck was stopped to rectify this condition. The truck was on an incline and was moved onto highway No. 281 about 100 feet south on said highway, where it was stopped temporarily on the west edge of the paving. There was a light at each corner of the truck, a cluster of three lights across the center, and a tail or stop light; in all, six lights, burning. When the truck stopped on the highway Munson remained in the car following the truck on the side road leading into the intersection. The highway at the point where the truck stopped was

level for a half-mile or more ahead, and for a quarter of a mile back, of the truck.

The DeSoto car proceeded south on highway No. 281 for a distance of about two miles, when the collision occurred, about 80 rods south of a filling station opposite St. Libory. The driver Doherty explains the accident, in substance, as follows: The DeSoto car was proceeding along the pavement on the right-hand side of the center thereof, going south, at a rate of speed of 30 miles an hour, and when within 10 or 15 feet of the truck, and just before the crash, the driver applied his four-wheel brakes, which were in good condition. A red light appeared all at once. There was no person signaling with a flashlight. The front part of the DeSoto car from the radiator back to the windshield went under the truck, took the top off the radiator and drove the hood of the engine back, breaking out the windshield and throwing the driver through the left front door. The driver stated that the night was very dark, bitter cold, and blustery, and the highway was dark. Other witnesses, including an expert, testified that the night was clear and stars were shining, and some of the witnesses for the plaintiff testified that there was frost in the air and it was foggy.

When the truck stopped on the highway the driver stepped out on the running board, looked back towards the north, and could see no cars. He went immediately to the back of the truck, found that some of the cattle were down and endeavored to get them up. When Volke, who had remained in the driver's seat, was getting out to go back to see what had happened, the crash occurred, he said, within two or three minutes altogether. Munson stated he saw the DeSoto car immediately at the time the truck stopped; he did not contemplate going onto the highway until the cattle were up; he blinked the lights on his car two or three times before the DeSoto car arrived at the point adjacent to the intersection. Defendant Baack stated that before the truck entered the highway he noticed that some cattle were down and concluded that there was no use try-

ing to get them up, because of the incline on the side road, so suggested to the driver to pull onto the highway, and as the driver got into the cab to comply defendant walked on the right-hand side of the truck, watching the driver maneuver to the place where he stopped the truck. After the truck stopped defendant ˮwalked to the rear end to examine the cattle, saw that two of them were down, and proceeded towards the front end of the cab to obtain flares.

With reference to the shoulder of the road, west of the edge of the oil mat, the road boss testified that the shoulder was between four and five feet in width, of clay soil, solid and rolled with a heavy roller. Volke testified that the shoulder did not appear to be solid. The defendant testified that he observed the shoulder of the road and considered that it was not packed well enough to carry the weight of the truck, and, further, that the truck was parked less than four inches from the west edge of the pavement; that is, the west edge of the truck wheels were four inches from the west edge of the pavement. Doherty stated that the truck was standing so that the inside edge of the box of the truck would be a distance of 12 inches, or thereabouts, from the white line. Leo Cordes, a witness for plaintiff, testified that he observed the truck on the right-hand side of the highway, facing south, and that all wheels were on the pavement. Sheriff Petersen testified that the shoulder of the road was a little sandy and did not look to be firmly packed.

There is evidence of a conversation between Doherty and defendant, wherein defendant said that he did not have the flares out; also that he went around the side of the truck next to the ditch, back of the DeSoto car, got the flares out and came back with them. The foregoing statement of the evidence brings us to a consideration of the following statutory provisions:

Section 39-11,112, Comp. St. Supp. 1937, provides in part: "The operator of a motor truck or combination thereof, * * * shall immediately upon bringing his vehicle to a stop upon or immediately adjacent to the traveled portion of

the highway at any time during the period of from one-half hour after sunset to one-half hour before sunrise, place one lighted flare at the side of such vehicle just inside the black line marking the center of paved highways and near the center of dirt or gravel highways, place one lighted flare approximately one hundred feet to the rear of such vehicle and place one lighted flare approximately one hundred feet to the front of such vehicle; and shall maintain such lighted flares in such position during the time said vehicle remains parked."

The court instructed "that the word 'immediately,' as used in the law requiring the flares to be placed, means with reasonable and proper diligence, or promptly, and what would constitute immediately would depend upon all of the facts and circumstances proved. The term 'immediately' should be reasonably construed in connection with the attendant circumstances."

Section 39-1154, Comp. St. Supp. 1937, provides in part: "No person shall park or leave standing any vehicle, whether attended or unattended, upon the paved or improved or main traveled portion of any highway, outside of a business or residence district, when it is practicable to park or leave such vehicle standing off the paved or improved or main traveled portion of such highway; provided, in no event shall any person park or leave standing any vehicle, whether attended or unattended, upon any highway unless a clear and unobstructed width of not less than fifteen feet upon the main traveled portion of said highway opposite such standing vehicle shall be left for free passage of other vehicles thereon."

The foregoing provisions of the statute place positive duties upon the defendant and the driver of the truck. The trial court properly instructed the jury as to the duty required of the owner of the truck, or his driver, in placing flares and when they should be placed, and further instructed, as heretofore stated, as to the manner in which the term "immediately" should be construed. The evidence with reference to the shoulder of the highway west of the

line of the pavement, and as to whether or not the load in the truck could be supported by the shoulder, is in conflict. The facts thus being in controversy, the issues involved in this respect were questions for the jury's determination.

Section 39-1176, Comp. St. Supp. 1937, provides in part: "The head lamps of motor vehicles shall be so constructed, arranged, and adjusted that * * * (with certain exceptions) they will at all times mentioned * * * and under normal atmospheric conditions and on a level road produce a driving light sufficient to render clearly discernible a person two hundred feet ahead, but shall not project a glaring or dazzling light to persons in front of such head lamp."

The testimony with reference to the lights on the DeSoto car may be summarized in the following respects: The driver of the car could have avoided the accident if he had seen the truck within a radius of 50 to 75 feet of his lights. He could have avoided the accident had he seen the truck within a radius of 25 feet. He saw the truck when he was within 10 or 15 feet of it. The lights on the truck were burning, and the lights on the DeSoto car would penetrate so that a man could be seen within a radius of 30 feet in front of the lights. The last cited statutory provision and facts stated with reference thereto constitute the principal charge of negligence against the driver of the DeSoto car.

The cases of *Roth v. Blomquist,* 117 Neb. 444, 220 N. W. 572, *Most v. Cedar County,* 126 Neb. 54, 252 N. W. 465, and *LaFleur v. Poesch,* 126 Neb. 263, 252 N. W. 902, are cited on the principle that it is negligence as a matter of law for a motorist to drive a motor vehicle on a public highway at such a rate of speed that it cannot be stopped or turned aside in time to avoid an obstruction discernible within the range of his vision ahead. See, also, *Tomjack v. Chicago & N. W. R. Co.,* 116 Neb. 413, 217 N. W. 944.

In the instant case, the petition charged that the proximate cause of the collision was the carelessness and negligence of the defendant. The answer charged that the contributory negligence on the part of the plaintiff, combined with the negligence of the driver of the car in which she

was riding, was the proximate cause of the collision. And, in addition, the court instructed that, if the jury should find from the evidence that the defendant and the driver of the car in which plaintiff was riding as a guest were both negligent in a manner which contributed to plaintiff's injury and was the proximate cause of the injury, this fact would not defeat recovery. The foregoing cases would be pertinent to the issues in this case if the evidence did show that the negligence of the driver of the car in which plaintiff was riding was the proximate cause of her injury. The evidence does not disclose that this is the fact.

The law is well settled by the decisions of this court that a violation of statutes regulating the use and operation of motor vehicles upon the highway is not negligence *per se* but evidence of negligence that may be taken into consideration with all the other facts and circumstances, in determining whether or not negligence is established thereby.

It is the law of this state that in cases of this character negligence of the driver cannot be imputed to a guest in the automobile.

"A person riding in an automobile driven by another, even though generally not chargeable with the driver's negligence, is not absolved from all personal care for his own safety, but is under the duty of exercising reasonable care to avoid injury. The care exacted is that which an ordinarily prudent person would exercise under like circumstances." 5 Am. Jur. 769, sec. 475.

In the case of *Hendren v. Hill*, 131 Neb. 163, 267 N. W. 340, we find this statement (p. 167) : "The qualification is that the same degree of care is not required of the guest as of the driver. If the guest perceives danger, or if at certain times or places he should anticipate danger, such as at railway crossings, he should warn the driver, but ordinarily he need not watch the road or advise the driver in the management of the car."

The plaintiff had a right to assume that the driver was a reasonably safe and careful driver. When a situation

arises which is out of the ordinary, the guest is under the duty to warn the driver of dangers which would be apparent to the guest. The windshield on the DeSoto car was cleaned and the radiator replenished with water just prior to the time the car entered on the pavement, going south, which was two miles north of the scene of the accident. The pavement was level; the driver had a clear vision ahead; the plaintiff was seated at the right of the driver, not paying particular attention to the road, had slumped in her seat and was a little drowsy, shortly before the crash. There was nothing said by any person in the car just prior to the crash. Under the circumstances, there was no apparent reason for plaintiff to anticipate or perceive danger of such a nature as would place the duty upon her to warn the driver.

We believe that the evidence was inadequate to submit to the jury, in any event, the question of contributory negligence on the part of this plaintiff, and the instructions given by the court in reference to comparative negligence as between the alleged contributory negligence of the plaintiff and the negligence of the defendant, even if erroneous, are not applicable to the situation and, therefore, not prejudicial to the defendant.

The defendant, at the conclusion of the trial, asked leave to amend the answer to show that the plaintiff negligently acquiesced in the driving of the DeSoto car without lawful lights thereon. The evidence fully covers this situation, as do the instructions of the trial court. There was no prejudicial error in the refusal of the court to. allow the amendment.

The claim made by the defendant in relation to frost forming on the windshield of the DeSoto car, and steam coming from the top of the radiator and freezing on the windshield, as a ground of negligence, is not supported by the record, and the claim made by the plaintiff that three men were working behind the truck, obscuring the lights burning on the truck, is likewise not sustained by the evidence. The driver of the truck, however, was caught be-

tween the truck and the DeSoto car at the time of the crash.

The defendant predicates error upon the failure of the court to direct a mistrial when, on redirect examination, one of the witnesses for the plaintiff testified in reference to insurance. We deem it advisable to set out this testimony somewhat in detail. The cross-examination conducted by Mr. Prince, representing the defendant, is in part: "Q. About the first of December, 1937, didn't you talk to a man by the name of Blocke and sign a written statement? A. I don't remember the man's name. Q. Do you remember of signing it? A. Yes. Q. That was a day or two after the accident, second or third day? A. Are you referring to the lawyer? Q. The man who came out and had you sign this statement? A. Yes. Q. Calling your attention to exhibit one, is that your signature at the bottom of that writing? A. Yes. Q. Did you read it over at that time? A. Yes. Q. In that statement didn't you tell him it was a clear night? A. No; I didn't. Q. But you signed the statement; read the statement and see if that is not in that, the very last words, the line immediately above your signature? A. It was foggy." From this point the testimony continued as to whether or not witness had made contradictory statements in the trial of the case when he was being examined as to weather conditions on the night in question. On redirect examination of the witness by Mr. Davis, we find the following: "Q. Who was it that got you to sign a statement? A. A lawyer for the insurance company. Q. What was his name? By Mr. Prince: The defendant now moves that a mistrial be declared in this case and asks leave to withdraw the jury. The Court: Q. For what? By Mr. Prince: A. Misconduct of counsel and the answer that has been given. Court: Overruled. By Mr. Davis: Q. Did you tell him at the time you signed the statement that it was clear that night? A. I don't believe I did, I think I told him it was foggy. Q. In whose handwriting is that statement that was presented to you? Is it in your handwriting? A. No." Recross-examination by Mr. Prince: "Q. But

you did sign it? A. Yes. Q. And read it over before you signed it? A. Yes."

The rule in Nebraska, stated in *Fielding v. Publix Cars, Inc.*, 130 Neb. 576, 265 N. W. 726, is: "In an action against a taxicab company for injuries to a passenger, it is reversible error for the trial court to permit plaintiff on his case in chief to show that defendant is indemnified from loss by an insurance company, where such proffered evidence is not relevant to any material issue in the case;" revoking the rule of practice promulgated in *Jessup v. Davis*, 115 Neb. 1, 211 N. W. 190.

The injection of insurance into the instant case rests primarily upon the following question and answer on redirect examination by plaintiff's counsel: "Q. Who was it that got you to sign a statement? A. A lawyer for the insurance company."

In the case of *Moy Quon v. Furuya Co.*, 81 Wash. 526, 143 Pac. 99, the claim agent called on the injured man in the hospital, and propounded to him carefully written questions, and subsequently the claim agent was called for the purpose of discrediting the injured person's testimony. On cross-examination, it developed that this witness was a claim agent from the casualty company which carried appellant's liability insurance. The court referred to the general rule and made this statement: "This rule, however, was never intended to override the equally positive and salutary principle that a party has the right to cross-examine the witnesses produced by his adversary touching every relation tending to show their interest or bias. * * * When a party offers a witness, the relations of that witness to the thing in issue and his interest in the result become material as affecting his credibility. It is universally held that these things may be developed on cross-examination." They may be likewise developed on redirect examination when a statement is taken by a representative of the defendant and a witness interrogated in reference thereto by defendant's counsel.

In *Gianini v. Cerini*, 100 Wash. 687, 171 Pac. 1007, the

court said: "In the instant case, counsel for defendant having gone into the matter of the statement signed by plaintiff, it was entirely proper for the plaintiff to show on redirect, all the circumstances under which the statement was made and to develop the entire conversation relating thereto. The evidence, therefore, was competent, and the mere fact that it may have been prejudicial did not render it inadmissible. If the effect was harmful, such was the defendants' misfortune, rather than the plaintiff's fault." See annotation, 56 A. L. R. 1439.

In *Treftz v. Kirby,* 146 Atl. 688 (7 N. J. Misc. 555) counsel, on redirect examination, inquired of a witness to whom his statement was made. The court held: "In action for automobile collision damages, where plaintiff's witness was cross-examined as to whether he had made statement in writing as to details of accident, there was no error in permitting plaintiff on redirect to inquire to whom statement was made, nor was the answer that such statement was made to insurance man any ground for declaring mistrial." See, also, *Webb v. Hoover-Guernsey Dairy Co.,* 138 Or. 24, 4 Pac. (2d) 631, wherein it was said: "When parties interested, either directly or indirectly, in the result of litigation, send their agents to interview witnesses and prepare statements for such witnesses to sign, the jury has not only the right to know who such agents are, but whom such agents represent, when a discrepancy arises between the testimony given by the witness on the stand and the statement prepared by such agent." This would be especially true when the statement is presented by counsel for defendant to a witness for the plaintiff and apparently for impeachment purposes. In the instant case the rule as announced in the preceding cases governs.

Reference is made to a scar received by the plaintiff while en route to trial in the instant case, assuming that she was endeavoring to recover for injuries sustained in another accident. This matter is fully explained in the evidence and is not prejudicial.

The injuries received by the plaintiff as the result of the

collision sustain the jury's verdict. Other assignments of error are without merit.

For the reasons given in this opinion, the verdict of the jury and the judgment of the trial court thereon are

AFFIRMED.