DANIEL R. HEGARTY, JR., APPELLANT AND
CROSS-APPELLEE, V. CAMPBELL SOUP COMPANY,
A NEW JERSEY CORPORATION, ET AL., APPELLEES AND
CROSS-APPELLANTS.

335 N.W.2d 758

Filed June 24, 1983. No. 82-341.

Peter J. Hoagland, Warren C. Schrempp and Steven Lefler of Schrempp & Lefler, for appellant.

Larry E. Welch and David M. Woodke of Gross, Welch, Vinardi, Kauffman & Day, P.C., for appellees.

KRIVOSHA, C.J., BOSLAUGH, McCOWN, WHITE, HASTINGS, CAPORALE, and SHANAHAN, JJ.

BOSLAUGH, J.

This action arose out of a truck-train collision which occurred at about 3 a.m. on December 21, 1978, just east of the intersection of 12th Street and Capitol Avenue in Omaha, Nebraska. The plaintiff, Dan Hegarty, an engine foreman or foreman of a switch crew employed by the Union Pacific Railroad Company, was injured when a truck leased by Campbell Soup Company and driven by its employee, Lynn Peterson, collided with a boxcar upon which the plaintiff was riding. This suit was brought against Campbell Soup Company, Rapid Ways Truck Leasing, Inc., and Peterson, to recover damages for the injuries sustained by the plaintiff in the accident. Peterson was subsequently dismissed as a defendant.

The evidence shows that the plaintiff was serving as "point" man on the railroad switch crew which was delivering boxcars to industries in downtown Omaha. The train, which was approximately 250 feet long, consisted of four boxcars which were being pushed in a westerly direction by a switch engine. The track ran along the south side of Capitol Avenue and ended near 13th Street where the World-Herald building is situated. Of the cars in the train, one car was to be delivered to the World-

Herald building, two cars to Capitol Liquors, and one car to Beebe & Runyan Furniture.

The plaintiff was riding on a ladder on the north side at the west end of the first boxcar, which was the car that was to be delivered to the World-Herald. The plaintiff was responsible for guiding the train through intersections, since the engineer could not see from his position in the switch engine at the rear of the train. The plaintiff communicated with the engineer by using his radio and his railroad lantern.

As the train proceeded west on Capitol Avenue it passed an Allied Van Lines parking lot west of 11th Street. Trailers which were parked there obscured the plaintiff's view to the south of the 12th and Capitol intersection for a time. As the train approached the intersection of 12th Street and Capitol Avenue, the plaintiff observed the truck operated by Peterson traveling in a northerly direction on 12th Street, so he advised the engineer to go slowly. The plaintiff estimated the speed of the train to be about 2.5 m.p.h. at that time. When the train was still east of the 12th Street intersection, the truck stopped at the stop sign on the south side of Capitol Avenue which is set back approximately 33 feet from the intersection. The truck then proceeded into the intersection, making a right turn onto Capitol Avenue. The plaintiff assumed that, because the intersection was well lighted, the truckdriver saw the train. However, when it became apparent to the plaintiff that the driver did not see the train, the plaintiff advised the engineer to stop the train, swung his right foot around to the front of the boxcar, and shined the bright light of his lantern into the windshield of the truck. The truck was about 15 feet away at the time the plaintiff shined the lantern at the truck. The truck did not stop or turn aside, and the right side of the truck collided with the boxcar. The impact occurred just east of the intersection.

The plaintiff sustained a severe injury to his pelvis and was hospitalized for 9 weeks. Due to a resulting

loss of nerve function, he has a permanent partial loss of use of his left leg and wears a brace to aid in walking. He is unable to stand for long periods of time or to do any climbing.

On the date of the accident the plaintiff was employed as a switchman-brakeman, a union position. He had a seniority date of June 10, 1965. Seniority is an important factor in determining salary and promotions, and also determines whether a railroad employee may be subject to a layoff. The plaintiff's injury prevents him from returning to work as a switchman-brakeman. He is presently employed by the Union Pacific as a terminal trainmaster, a non-union management position which in his case is basically a "desk job." Some adjustments have been made in the basic job description to accommodate his physical condition. At his present job the plaintiff earns $2,900 a month. In 1978 he had earned approximately $24,000, until the date of the accident.

Issues of negligence, contributory negligence, and assumption of risk were submitted to the jury which returned a verdict in favor of the plaintiff in the amount of $519,257. The defendants then filed a motion for a new trial which was sustained. The plaintiff has appealed from the order granting the new trial. The defendants raise three assignments of error on their cross-appeal.

One of the principal issues in dispute was whether an ordinance of the city of Omaha was applicable to the facts in this case. The ordinance, No. 33.08.040, provides as follows: "FLAGMEN AND WATCHMEN - When switching is being done over highway or street railway crossing by yard or trainmen, a man must be stationed at that crossing to act as flagman.

"The watchmen herein provided for shall be stationed at their respective places from date of passage of this chapter.

"The City Council may at any time by concurrent

resolution, designate other and additional crossings where watchmen or other forms of crossing protection are to be provided.

"A watchman stationed at any of the crossings provided for in this chapter, who shall fail or neglect to warn any person about to cross any railroad track at such crossings of the approach of any locomotive, tender or car upon such track, shall be guilty of a misdemeanor, and on conviction thereof shall be punished as hereinafter provided (Ord. 14924 Sec. 47-2.1 Part; May 13, 1941.)"

It is undisputed that a flagman was not stationed at the intersection of 12th Street and Capitol Avenue at the time of the accident. The plaintiff was riding on the boxcar at the time of the impact, and the train had not entered the intersection when the collision occurred.

The defendants' theory of the case was that the plaintiff was engaged in a "switching" operation at the time of the accident and the ordinance was relevant on the issue of contributory negligence. The plaintiff denied that he was engaged in a switching operation. The trial court refused to admit the ordinance into evidence and refused to instruct the jury as to the ordinance. Later, the trial court determined that the ordinance was relevant and sustained the defendants' motion for new trial on the ground that it was error to refuse to admit the ordinance into evidence and instruct the jury concerning it.

The standard of review of an order granting a new trial is whether the trial court abused its discretion. This court will not disturb an order granting a new trial unless it clearly appears that no tenable grounds existed therefor. *Shreves v. D. R. Anderson Constructors, Inc.*, 206 Neb. 433, 293 N.W.2d 106 (1980); *County of Hall ex rel. Wisely v. McDermott*, 204 Neb. 589, 284 N.W.2d 287 (1979). A motion for new trial should be granted only where there is error prejudicial to the rights of the unsuccessful party.

Unless such error appears, a party who has sustained the burden and expense of trial, and who has succeeded in securing a verdict on the facts in issue, has a right to keep the benefit of that verdict. *Shreves, supra*; *County of Hall ex rel. Wisely, supra.*

From our review of the record we have concluded that the evidence shows as a matter of law that the sole proximate cause of the collision was the negligence of the driver Peterson, and a verdict on the issue of liability should have been directed in favor of the plaintiff. Thus, any error in failing to admit or instruct upon the ordinance was harmless error. *McClellen v. Dobberstein*, 189 Neb. 669, 204 N.W.2d 559 (1973); *Leichner v. First Trust Co.*, 133 Neb. 170, 274 N.W. 475 (1937).

Failure to comply with the directives of the ordinance could only be evidence of contributory negligence to be considered by the jury in connection with other evidence bearing upon the issue. A failure to comply with the ordinance would not constitute contributory negligence per se. *Clark Bilt, Inc. v. Wells Dairy Co.*, 200 Neb. 20, 261 N.W.2d 772 (1978); *Krehnke v. Farmers Union Co-Op. Assn.*, 199 Neb. 632, 260 N.W.2d 601 (1977).

The evidence shows that, at the time of the accident, the night was clear and the intersection was well lighted. Peterson, the driver of the truck, admitted that he was familiar with the intersection, having driven through it every work night for 3 years. He knew it was customary for trains to be on that track early in the morning. Peterson testified that while stopped at the stop sign he "did not spend no time looking to see if there was a railroad train in the area." Although Peterson had an unobstructed view for a considerable distance to the east had he looked in that direction, he never looked to the east after stopping at the stop sign. He testified that he did not see the train until he collided with it.

The evidence is that the train's bell was ringing and the whistle blowing. The plaintiff shined his

railroad lantern directly into the truck's windshield when the truck was about 15 feet away from the boxcar, but the truck failed to stop or turn aside.

No other conclusion can be reached from a review of the evidence but that Peterson's negligence was the proximate cause of the accident. Any contributory negligence on the part of the plaintiff was not a proximate cause of the collision. A directed verdict should have been granted in favor of Hegarty.

The applicable rule was stated in *Starlin v. Burlington Northern, Inc.*, 193 Neb. 619, 228 N.W.2d 597 (1975). In *Starlin* the passenger in an automobile sued the railroad for damages resulting from the collision of the car with a train. This court reversed the judgment for the plaintiff, finding that the negligence of the driver in failing to see the train was the sole proximate cause of the accident. We said at 623, 228 N.W.2d at 600: "The law in Nebraska is well settled that if the operator of a motor vehicle is familiar with a railroad crossing and the surroundings, it is his duty to look and listen at a time and place where looking and listening will be effective even though vision of the tracks is restricted, a failure to do so is less than the exercise of due or ordinary care and no recovery can be had for damages resulting from collision with a passing train. It is the duty of the driver of the automobile to have his car under such control that, when it comes to a place where it is possible to see and to hear an approaching train, he can stop and avoid a collision. Loudy v. Union P. R.R. Co., 146 Neb. 676, 21 N.W.2d 431; Kennedy v. Chicago, R. I. & P. R.R. Co., 156 Neb. 345, 56 N.W.2d 446.

"The proximate cause of an injury is that cause which, in natural and continuous sequence, unaccompanied by any efficient, intervening cause, [produces the injury,] and without which the result would not have occurred. *Although the question of proximate cause is ordinarily for the determination*

*of the jury, where, upon the evidence produced, only one inference can be drawn, it is for the court to decide whether a given act or series of acts is the proximate cause of the injury.* Ecker v. Union P. R.R. Co., 164 Neb. 744, 83 N.W.2d 551.'' (Emphasis supplied.)

We think it is clear from the evidence in this case that Peterson's negligence was the sole proximate cause of the accident. No tenable reason exists to support the order granting a new trial on the issue of liability. It is, therefore, unnecessary to decide the applicability of the ordinance to the facts of this case.

On their cross-appeal the defendants have raised issues regarding certain instructions given and refused on the issue of liability. Because the case is one in which a verdict should have been directed on the issue of liability, no prejudice resulted from any error in instructions on the issue of liability. See *Snyder v. Fort Kearney Hotel Co., Inc.*, 185 Neb. 476, 176 N.W.2d 686 (1970).

The defendants contend that testimony by an economist, called as an expert witness by the plaintiff, with regard to the amount of lost wages the plaintiff would suffer if he became unable to work in the future was based upon speculation and conjecture and should not have been admitted. The economist merely multiplied the plaintiff's present salary by the number of years remaining until he becomes 65 years of age.

The evidence shows that the plaintiff is presently able to work and, in fact, was given a substantial merit raise shortly before trial. It also shows that the plaintiff now does not have as much job security as he had before the accident and that he performs his present job with certain limitations.

The evidence was properly admitted. The evidence shows there is a possibility that the plaintiff could lose his job, a possibility which the jury could consider and was free to accept or reject. The testi-

mony of the economist did not compel the jury to reach any conclusion with regard to the issue. Neb. Rev. Stat. § 27-702 (Reissue 1979) permits an expert to testify if his specialized knowledge would be helpful to the trier of fact. In *Christensen v. City of Tekamah*, 201 Neb. 344, 351, 268 N.W.2d 93, 98 (1978), we said: "Expert testimony is permitted even in areas where laymen have competence to determine the facts testified to by the expert where a trial court may feel the opinion would assist them. However, the trier of fact is not bound by the testimony of an expert witness. Here, we believe the facts are capable of proper consideration by laymen." The testimony was properly admitted as it was helpful to the jury in determining damages.

The defendants contend that it was error to exclude evidence of a "Mary Carter" agreement entered into by the plaintiff and the railroad. That agreement provided that the Union Pacific would pay the plaintiff $162,500 if he did not recover damages in this action. It further provided that if the plaintiff received a verdict for more than that amount, the Union Pacific would pay nothing to the plaintiff. If the plaintiff recovered less than $162,500 in this action, the Union Pacific would pay him the difference. Campbell Soup Company argues that the agreement gave the Union Pacific an interest in this action which affected the credibility of witnesses employed by the railroad who testified for the plaintiff. Specifically, Campbell Soup argues that the agreement should have been made known to the jury so that the jury could properly evaluate such witnesses' testimony.

Witnesses employed by the railroad testified with regard to such matters as seniority, employees' salaries, and employees' benefits. These were matters which had a bearing on the amount of damages the plaintiff had suffered because he was no longer able to work as a switchman-brakeman.

The "Mary Carter" agreement created an interest

on the part of the Union Pacific in the amount of damages recovered by the plaintiff in this litigation. An employer's interest in the litigation affects the credibility of an employee who testifies in the action upon issues affecting the employer's interest. See 98 C.J.S. *Witnesses* § 551 b. (1957). In *Gleason v. Baack*, 137 Neb. 272, 289 N.W. 349 (1939), we said with regard to a witness whose principal, an insurer, is interested in the outcome of an action: "In the case of *Moy Quon v. Furuya Co.*, 81 Wash. 526, 143 Pac. 99, the claim agent called on the injured man in the hospital, and propounded to him carefully written questions, and subsequently the claim agent was called for the purpose of discrediting the injured person's testimony. On cross-examination, it developed that this witness was a claim agent from the casualty company which carried appellant's liability insurance. The court referred to the general rule and made this statement: 'This rule [regarding the admissibility of liability insurance], however, was never intended to override the equally positive and salutary principle that a party has the right to cross-examine the witnesses produced by his adversary touching every relation tending to show their interest or bias. * * * When a party offers a witness, the relations of that witness to the thing in issue and his interest in the result become material as affecting his credibility. It is universally held that these things may be developed on cross-examination.' They may be likewise developed on redirect examination when a statement is taken by a representative of the defendant and a witness interrogated in reference thereto by defendant's counsel.

. . . .

". . . See, also, *Webb v. Hoover-Guernsey Dairy Co.*, 138 Or. 24, 4 Pac. (2d) 631, wherein it was said: 'When parties interested, either directly or indirectly, in the result of litigation, send their agents to interview witnesses and prepare statements for such witnesses to sign, the jury has not only the right to

know who such agents are, but whom such agents represent, when a discrepancy arises between the testimony given by the witness on the stand and the statement prepared by such agent.' " *Id.* at 282-83, 289 N.W. at 355-56.

A party has the right to cross-examine a witness with regard to an interest which affects credibility. *Eden v. Klaas,* 166 Neb. 354, 89 N.W.2d 74 (1958). Failure to permit such inquiry constitutes reversible error if prejudice results to the complaining party. See *State v. Matejka,* 186 Neb. 454, 183 N.W.2d 917 (1971).

Other jurisdictions have held that it is prejudicial error to prohibit inquiry into the existence of a "Mary Carter" agreement. In *General Motors Corp. v. Lahocki,* 286 Md. 714, 728, 410 A.2d 1039, 1046 (1980), the court said: "The majority view as embodied in cases such as *Maule Industries v. Rountree, supra; Ward v. Ochoa, supra; Reese v. Chicago, B. & Q. R.R.,* 55 Ill.2d 356, 303 N.E.2d 382 (1973); *Bristol-Myers Co. v. Gonzales,* 561 S.W.2d 801 (Tex. 1978); and *General Motors Corp. v. Simmons,* 558 S.W.2d 855 (Tex. 1977), is that such agreements are not bad generally, but prejudice is shown warranting a new trial if they have not been disclosed upon proper motion and admitted into evidence. The reason for this is that in judging the credibility of a witness the jury is entitled to know of his interest in the outcome." See, also, Annot., 65 A.L.R.3d 602 (1975).

When the issue of liability has been determined and there has been error in the determination of damages such that the verdict must be set aside, a new trial may be limited to the issue of damages. *Schaffer v. Bolz,* 181 Neb. 509, 149 N.W.2d 334 (1967).

We conclude that the order of the trial court granting a new trial should be affirmed, but the new trial should be limited to the issue of damages only. The

cause is remanded with directions to limit the new trial to the issue of damages only.

AFFIRMED AND REMANDED WITH DIRECTIONS.