No. 57,055

JILL RATTERREE, *Appellee,* v. RICHARD A. BARTLETT, WILLIAM
MUNGER, and KANSAS FIRE & CASUALTY COMPANY, *Appellants,*
and JOSE HERNANDEZ, *Appellee.*

(707 P.2d 1063)

Opinion filed October 8, 1985.

*Larry G. Pepperdine,* of Fisher, Patterson, Sayler & Smith, of Topeka, argued the cause and *Ronald J. Laskowski,* of the same firm, was with him on the brief for appellants Bartlett, Munger and Kansas Fire & Casualty Company.

*Kerry D. Howlett,* of Thompson & Howlett, of Kansas City, argued the cause and *Charles W. Thompson,* of the same firm, was on the brief for appellee Hernandez.

*Charles D. Kugler,* of Vasos, Kugler & Dickerson, of Kansas City, argued the cause and was on the brief for appellee Ratterree.

The opinion of the court was delivered by

HERD, J.: This is an appeal from a jury verdict for damages for personal injuries resulting from an automobile/tractor-trailer collision. Plaintiff/appellee, Jill Ratterree, was a passenger in a car driven by defendant/appellee, Jose Hernandez. They collided with defendant/appellant, Richard Bartlett, who was driving a tractor-trailer. Ratterree sued both defendants and Bartlett's employer, William Munger, and insurer, Kansas Fire & Casualty Co. (KFC), for damages. Hernandez cross-claimed against Bartlett, Munger and KFC for his injuries sustained in the accident. Both Ratterree and Hernandez were awarded damages. Defendants Bartlett, Munger and KFC appeal.

On the evening of January 8, 1982, Ratterree met Hernandez at Jalisco's Restaurant in Kansas City, Kansas. Hernandez invited Ratterree to accompany him in his 1971 Porsche automobile to Kansas City International Airport to pick up a friend. Enroute to the airport, in a northbound lane of I-635 near Leavenworth Road, the Porsche was involved in an accident with a tractor-trailer truck driven by Bartlett. At the point where the accident occurred, I-635 is a 6-lane divided highway, with three northbound lanes, a right outside shoulder, and a left inside shoulder bordered by a guardrail.

The cause of the collision was disputed at trial. Bartlett testified he had been traveling in the center lane of I-635. Traffic was braking in front of him, so he turned on his left turn signal and moved to the left inside lane. He traveled there for approximately one-quarter to one-half mile when he felt something collide with his left front wheel. He looked down, saw a Porsche, moved to the right lane, and stopped on the shoulder.

Highway patrol officers LeRoy McConico, Jr., and George Tate investigated the accident. The officers testified the only point of impact with Bartlett's truck was at the left front bumper of the cab of the truck. The officers also testified there were rolling tire tracks from the Porsche automobile entering onto the shoulder and running parallel to the guardrail for approximately 75 to 90 feet prior to the collision with the guardrail.

According to appellees Ratterree and Hernandez, the accident occurred when the tractor-trailer driven by Bartlett cut suddenly, without warning, into the Porsche's lane of travel in the left northbound lane and collided with Hernandez' vehicle. As the wheels of the tractor-trailer moved toward the car, Ratterree shouted a warning. After the collision, Hernandez steered his vehicle onto the shoulder attempting to regain control. The Porsche traveled approximately 75 feet before striking the steel guardrail which runs parallel to the shoulder. The car then rebounded from that contact and began to spin down the roadway where it struck the guardrail again approximately 68 feet away and thereafter came to rest 60 feet further down the roadway.

Both Ratterree and Hernandez testified they believed they collided with the left rear wheels of the tractor-trailer when Bartlett moved from the center lane into the left lane.

The shoulder, at the point of the collision, is six feet wide. On the night of the accident there was snow and ice packed against the guardrail and on the shoulder from recent snows and road-clearing operations.

At some point during the collision, the door of the car was torn open and as the car spun, Ratterree was thrown onto the highway. As a result, she sustained severe head injuries, which caused brain damage and other loss of mental skills. At the time of the accident she was an electronics assembler at Butler National Corporation in Lenexa, Kansas. At the time of the appeal she was unemployed, continued to suffer from pain, and had been diagnosed as suffering from depression due to the consequences of the accident.

Hernandez also suffered injuries for which he received medical treatment. Hernandez testified he continues to experience pain and other injury-related physical ailments.

Ratterree initiated this litigation by filing suit on August 27, 1982, naming in her petition as defendants Richard Bartlett, the tractor-trailer driver; William Munger, his employer; the Kansas Fire & Casualty Company, the common carrier insurer; and Jose Hernandez, operator of the car in which she was a passenger. Hernandez cross-claimed against the other defendants for personal injuries he suffered in the collision.

Just prior to trial Hernandez' insurance company and Ratterree entered into a compromise settlement of her claim against Hernandez. The morning of trial defendants and the trial court were advised of the settlement, but not of its terms. Hernandez remained in the suit as a named defendant at trial. Defendants requested the settlement agreement be produced at trial and that it be admitted into evidence. The trial court denied the motions.

The matter was tried to the jury, which found Bartlett 90% at fault and Hernandez 10% at fault in causing the accident. The jury awarded Ratterree $400,000 in damages and Hernandez $50,000 in damages on his cross-claim.

Bartlett, Munger and KFC appeal.

The first issue to be considered is whether the trial court erred in prohibiting the testimony of the two highway patrol officers as to their opinion that Hernandez was passing on the shoulder at the time of the collision.

Highway patrol officers LeRoy McConico, Jr., and George

Tate investigated the accident. Based on the physical evidence at the scene, they were of the opinion that Hernandez was in the process of passing on the inside shoulder of the highway at the time the accident occurred. At trial, after the officers testified that the physical evidence showed Hernandez' vehicle was on the shoulder, appellants sought to have them testify as to whether in their opinions Hernandez was on the shoulder trying to pass. The trial court excluded the opinion testimony.

Appellants contend this exclusion was in error since the testimony was proper expert opinion testimony. In support appellants cite *Lollis v. Superior Sales Co.*, 224 Kan. 251, 580 P.2d 423 (1978). In *Lollis* we held opinion evidence by investigating police officers concerning physical factors of an accident is admissible when a proper foundation for such conclusions is presented and the conclusions are the proper subject of expert testimony. Appellants argue the two tests were met in this case.

Officer McConico testified he had fourteen years of law enforcement experience and had been in accident investigation throughout his entire fourteen years. McConico further related he had received accident investigation training from three police departments, as well as from the Kansas Highway Patrol. Officer Tate, a twenty-four year veteran of the highway patrol, testified he had investigated over 1,000 accidents during his career as a highway patrolman. Appellants argue the officers' accident investigation experience provided a sufficient foundation for their conclusions regarding the cause of the accident.

Appellants also argue the officers' opinions were the proper subjects of expert testimony since they were based upon facts and data personally perceived by them at the scene of the accident, which was within their special knowledge, skill, experience and training. They also argue the testimony would have aided the jury in the interpretation of technical facts so it could better understand the significance of physical facts admitted into evidence.

Appellees do not attack the foundation of the opinions, although the court excluded the testimony because the officers were not accident reconstruction experts. Appellees instead argue the issue as to Hernandez' state of mind regarding his reason for driving on the shoulder was an improper subject for expert opinion since it went to the ultimate issue to be decided

by the jury. The drawing of conclusions by experts regarding the ultimate issue of negligence is not allowed. Appellees argue the testimony appellants were endeavoring to elicit from the officers, that Hernandez was "passing on the shoulder," was synonymous with fault, and therefore improper.

In *Morlan v. Smith,* 191 Kan. 218, 380 P.2d 312 (1963), we held an officer's statement that "no improper driving indicated" was a pure conclusion of the investigating officer concerning the very question of negligence, which only the jury was allowed to decide. In *McGrath v. Mance,* 194 Kan. 640, 642, 400 P.2d 1013 (1965), this court found the officer's notation that plaintiff was guilty of "inattention" and an "improper start from parked position" was nothing more than his opinion regarding a question which was for the jury to decide. The court in *Lollis v. Superior Sales Co.,* 224 Kan. 251, cited by appellants, also held expert witnesses in automobile accident negligence cases may not state their opinions as to what actions of the parties, if any, contributed to the collision or who was at fault in causing the collision.

Therefore, the officers' testimony as to the position of the Hernandez vehicle at the time of the collision was proper, including their testimony that the vehicle had all four wheels on the shoulder when the collision occurred. Their testimony, however, regarding their opinions as to Hernandez' intent in driving on the shoulder was improper opinion testimony since such testimony would have invaded the province of the jury on the ultimate issue of negligence. We hold the trial court did not err in excluding such opinion evidence.

Appellants next argue the trial court erred in refusing to give their requested instruction regarding driving left of a yellow line.

At trial, appellants submitted the following instruction:

"The laws of Kansas provide that a solid yellow line delineates the left edge of [a] divided highway and indicates a restriction against passing on the left of such yellow line. Where such markings are in place, no driver shall, at any time, drive on the left side of such pavement striping."

The court refused to give the instruction, ruling that:

"I read the statute [K.S.A. 8-1520] cited by counsel and I quite honestly don't think that based on the evidence presented in this case that the statute applies and I don't think that the statute actually says what the instruction says in essence, so the requested addition to instruction No. 6 will be denied."

Appellants contend their instruction was properly based on

K.S.A. 8-1520, which prohibits driving on "the left side of any pavement striping designed to mark such no-passing zone." The failure to give this instruction, appellants argue, misled the jury "as they were not fully apprised of applicable law pertaining to this issue."

Appellee Ratterree argues in response that the court has the duty to instruct the jury only on applicable statutes. She further argues a party is entitled to an instruction explaining the theory of his case only where evidence is introduced to support that theory. *Shawnee Township Fire District v. Morgan,* 221 Kan. 271, 277, 559 P.2d 1141 (1977). She contends no evidence was admitted at trial to substantiate the purpose of the left-hand yellow line. Further, appellee points out, K.S.A. 8-1520 does not apply when an obstruction exists in the roadway. See K.S.A. 8-1520(c) and K.S.A. 8-1514(a)(2). Thus, appellee argues, under the emergency circumstances of this case, Hernandez was permitted to drive left of the yellow line and appellants' proposed instruction would have automatically condemned such driving. We agree. The proposed instruction did not accurately state the law applicable in this case. The trial court did not err by refusing to give appellants' proposed instruction.

Appellants next argue the trial court erred in excluding testimony concerning the smell of alcohol on Hernandez' breath. At trial, appellants attempted to have the two highway patrol officers testify they smelled alcohol on Hernandez' breath. The court ruled this was inadmissible since the officers specifically stated they did not consider alcohol to be a contributing factor to the accident and did not test Hernandez for intoxication, despite the smell of alcohol on Hernandez' breath. The court concluded the evidence would be more prejudicial than probative and was therefore inadmissible pursuant to K.S.A. 60-445.

Appellants argue the court's ruling was erroneous since the smell of alcohol was relevant to why Hernandez may have attempted to pass on the shoulder. Appellees argue appellants did not allege Hernandez' intoxication as a ground for negligence in the pretrial order. Additionally, appellees note, at trial Hernandez admitted having one drink on the day of the accident and, thus, the testimony of the officers would be merely cumulative. Appellees finally argue the officers' proffered testimony was that alcohol was not a contributing factor to the accident.

Under the circumstances of this case, where the officers who saw and interviewed Hernandez at the accident scene and from that concluded alcohol was not a contributing factor in the accident and confirmed that opinion by deciding not to test him for intoxication, we hold the trial court correctly ruled the evidence of the smell of alcohol on Hernandez' breath would be more prejudicial than probative and correctly excluded the evidence. See K.S.A. 60-445.

The next issue raised by appellants is the trial court erred in refusing to allow testimony regarding Ratterree's failure to use a seat belt and failing to instruct the jury as to such being an element of fault.

Appellants admit this same argument was made and rejected in *Taplin v. Clark,* 6 Kan. App. 2d 66, 626 P.2d 1198 (1981). Appellants merely urge reconsideration of that rule. In *Taplin,* the Court of Appeals held:

"A passenger in an automobile has no legal duty to use an available seat belt in anticipation of the driver's negligence, and evidence of nonuse is inadmissible under the comparative negligence doctrine either on the issue of contributory negligence or in mitigation of damages (following *Hampton v. State Highway Commission,* 209 Kan. 565, 498 P.2d 236 [1972])." 6 Kan. App. 2d 66, Syl. ¶ 1.

In this case appellants make no new arguments which were not fully considered in *Taplin* and *Hampton.* We find the decisions in those cases sound and thereby controlling in the case at bar. Appellants' argument on this point is rejected. The trial court did not err in refusing to allow testimony regarding Ratterree's failure to use a seat belt and in failing to instruct the jury that the lack of seat belt use was negligence.

Appellants next argue the trial court erred in refusing to instruct the jury on four elements of plaintiff's alleged negligence. These are: (1) allowing Hernandez to drive without headlights; (2) riding in a car without headlights on; (3) failing to object to Hernandez' attempting to pass on the shoulder of the roadway; and (4) failing to keep a proper lookout.

Appellants argue there was substantial evidence that each of these allegations was true and was therefore evidence of plaintiff's negligence.

The only evidence that Hernandez did not have headlights was from the two officers who worked the accident. Both officers testified they observed no broken headlights on the roadway and that the headlight sockets appeared to be rusted as though there

had been no headlights in the sockets for some time. Contrary to this was the testimony of Mike Rogers, the tow truck operator summoned to the scene of the accident. As a tow truck operator, part of Rogers' duties was to clear the area of accident debris. Rogers testified he is familiar with the headlight assemblies of Porsche automobiles, which consist of small doors which contain the sealed beam headlights that rise up when turned on. He testified that at the accident scene he cleaned up Porsche headlight glass shards and one headlight insert, and that he found the other headlight pushed up into the car. Additionally, Ratterree's testimony was that when Hernandez started the vehicle she saw the illumination of the headlights in a store front window and observed them on the roadway. Hernandez testified he had headlights, they were on, and he had also seen them in the store front window. This testimony squarely presented a fact issue for the jury. It held Hernandez 10% at fault in a general verdict. Thus, it is undetermined how the jury resolved the headlight issues. Therefore, it is possible for Ratterree to have been negligent on these issues as presented. If a passenger has knowledge of danger and the circumstances are such that an ordinary person would speak out or take other positive action to avoid injury to him or herself, then it is the passenger's duty to take the action the ordinary person would take under the circumstances. If there were no headlights, Ms. Ratterree had a duty to speak out and take positive action to avoid injury to herself. Under such circumstances, jury instructions should have been given as to her alleged negligence and her negligence, if any, should have been compared.

As to Ratterree's failure to object to Hernandez' driving on the shoulder of the road, according to Ratterree and Hernandez they were on the shoulder of the road as a result of Bartlett's trailer cutting into their lane and forcing them off the road. If such are the facts, Ratterree had no duty to object to Hernandez' driving on the shoulder. Thus, there is no evidence of Ratterree's negligence on this point and failure to instruct thereon was not error.

As to the contention that Ratterree failed to keep a proper lookout, both Ratterree and Hernandez testified Ratterree yelled to Hernandez to "look out," when the tractor-trailer driven by Bartlett moved into their lane. In *Miles v. West*, 224 Kan. 284, 580 P.2d 876 (1978), this court specifically held passengers were

not required to keep a lookout for other cars on the street. Additionally, this court held, "[a] passenger in an automobile is entitled to trust the vigilance or skill of the driver unless he is aware of the existence of a particular danger or knows from past experience or in some other manner that a driver is not vigilant or skillful." 224 Kan. at 289. Ratterree testified she had never ridden with Hernandez before and had no specific knowledge of any lack of skill on his part. She was therefore entitled to trust Hernandez' driving. See *Akins v. Hamblin*, 237 Kan. 742, 703 P.2d 771 (1985). The court did not err in failing to instruct on this issue.

Appellants argue the trial court erred in failing to instruct on Ratterree's claims against Hernandez, as set forth in the pretrial order. Appellants contend the jury was misled and confused by the posture of Hernandez as a defendant where the instruction indicated Ratterree was making no claim against him.

Appellees respond that the instruction was not erroneous since it was based upon the evidence at trial. There was no claim by Ratterree of negligence on the part of Hernandez in her testimony. The rule is that no instruction will be given if there is no evidence to support such an instruction. Since the evidence supported the instruction as given, it was not erroneous.

Appellants also argue the instruction on comparative fault is erroneous because it tells the jury the effect of a 50/50 verdict and because it failed to include Ratterree's name with those to be considered by the jury in assigning fault.

Appellees argue *Thomas v. Board of Trustees of Salem Township*, 224 Kan. 539, 582 P.2d 271 (1978), specifically approves the giving of an instruction which explains the effect of a 50/50 verdict. In so ruling, the court held, "[w]e have considered the pros and cons and have concluded it is not error for a trial court in this state to inform the jury as to the legal effect of its answers in a comparative negligence case." 224 Kan. at 551.

Appellee Ratterree also argues the trial court did not err in refusing to place her name into consideration for assignment of fault, since she was not negligent. Since there was evidence of Ratterree's possible negligence, as previously discussed, the trial court erred in refusing to allow comparison of her fault.

Appellants next argue the trial court erred in instructing the jury it could compensate Hernandez for disfigurement. The

instruction given by the trial court was based upon PIK Civ. 2d 9.01, which allows compensation for "pain, suffering, disabilities, or disfigurement." Appellants argue the instruction was improper because there was no evidence of any disfigurement of Hernandez as a result of the accident.

This court has defined disfigurement as:

" 'that which impairs or injures the beauty, symmetry or appearance of a person or thing; that which renders unsightly, misshapen or imperfect or deforms in some manner.' " *Smith v. Marshall*, 225 Kan. 70, 73, 587 P.2d 320 (1978).

There was evidence at trial that, as a result of the accident, Hernandez suffered from a locking elbow which occurred frequently and without warning. The trial court ruled this locking elbow was sufficient evidence of a disfigurement to warrant the instruction.

The locking elbow from which Hernandez suffers meets the definition of a disfigurement as set out in *Smith*. As previously stated, since there was evidence to support the instruction, the trial court did not err in so instructing the jury.

The next issue raised is whether the trial court erred in allowing testimony concerning the chances of Ratterree developing epilepsy as a result of her head injury.

The court allowed testimony by Doctors Abrams and Fowler concerning Ratterree's chances of developing epilepsy in the future. Appellants contend their responses were inadmissible under Kansas law. The doctors' testimony was that although Ratterree had never suffered an epileptic seizure, her chances of having one were from one to three percent. The doctors did not state whether they considered this a certainty, a probability, or a possibility. Appellants contend this low percentage is a mere "possibility" which is in violation of *Nunez v. Wilson*, 211 Kan. 443, 507 P.2d 329 (1973). In that case we held: "Expert witnesses should confine their opinions to relevant matters which are certain or probable, not those which are merely possible. However, no particular words of art are necessary to express the degree of proof required, and it is sufficient if the expert's words can be interpreted to show reasonable probability." 211 Kan. 443, Syl. ¶ 1. In so ruling, the *Nunez* court found the expert's testimony in that case "did have probative value on the issue of permanent injuries; [and] the jury should therefore have been

allowed to consider the testimony and determine for itself the weight it wished to accord it." 211 Kan. at 448.

The testimony given by the doctors in this case was that all head injury patients have a one to three percent chance of suffering from epilepsy; thus, Ratterree's chances were within that range.

This testimony is not the speculation or mere conjecture the *Nunez* court sought to eliminate. Rather, there was sound evidence as to what percentage chance Ratterree had of suffering from such a condition. Thus, as the *Nunez* court held, it was admissible, but it was up to the jury to weigh the evidence.

Appellants next argue the verdicts with regard to damages for Ratterree and the cross-claim of Hernandez were so excessive as to show they were given under the influence of passion and prejudice.

Appellants' claim of passion and prejudice is based solely on the amount of the verdicts. Ratterree was awarded $400,000 and Hernandez was awarded $50,000.

This court has held:

"Where a charge of excessive verdict is based on passion or prejudice of the jury, but is supported solely by the size of the verdict the trial court will not be reversed for not ordering a new trial, and no remittitur will be ordered unless the amount of the verdict in light of the evidence shocks the conscience of the appellate court." *Cantrell v. R. D. Werner Co.*, 226 Kan. 681, 686, 602 P.2d 1326 (1979).

Appellees note in response that this court has specifically held "the reviewing court must review the evidence in the light most favorable to the party prevailing below." *Wooderson v. Ortho Pharmaceutical Corp.*, 235 Kan. 387, Syl. ¶ 1, 681 P.2d 1038, *cert. denied* 469 U.S. 965 (1984).

In regard to the injuries of Hernandez, Dr. Steven Baker testified Hernandez sustained a hyperflexion, hyperextension neck injury resulting in muscle spasm, muscle strain and ligamentous sprain or tearing. As a result, Hernandez required treatment from January 20, 1982, to March 12, 1982, for pain in the cervical spine and neck, thoracic region and lumbar lower back, radiating pain to the right elbow as a result of vertebrae out of position and compression on nerve roots. In addition, sharp pain was radiated to the legs. Hernandez further sustained tendinitis to the right elbow and locking of that elbow. After treat-

ment was stopped in March 1982, Hernandez continued to suffer pain and his elbow continued to lock one to two times per month. Headaches also accompanied the pain.

As to the injuries of Ratterree, Dr. Abrams, appellants' own medical expert, testified Jill Ratterree had suffered a significant head injury in the collision from which numerous subsequent problems arose. He testified he felt she was in need of treatment and would require vocational rehabilitation, psychotherapy, counseling and medical management.

One of Ratterree's damage experts, Dr. Butts, a neuropsychologist, testified her head injury had resulted in brain damage. Her short-term ability to recall verbal instructions was severely impaired. The motor speed of her right hand had been slowed. Her I.Q., which had been in the normal range of 100, had been diminished to the borderline defective range of 77.

As a result of the head injury, Ratterree suffered continuous headaches, which in turn caused emotional problems. Dr. Butts concluded Ratterree was not employable, although this evidence was contradicted by appellants' witnesses. Her actual medical expenses were $8,400.

Appellees argue since the issue of damages is a difficult one to calculate, the law has given juries great leeway in this area. In *Kirk v. Beachner Construction Co., Inc.*, 214 Kan. 733, 737, 522 P.2d 176 (1974), we held:

" 'Pain and suffering have no known dimensions, mathematical or financial. There is no exact relationship between money and physical or mental injury or suffering, and the various factors involved are not capable of proof in dollars and cents. For this very practical reason the only standard for evaluation is such amount as reasonable persons estimate to be fair compensation for the injuries suffered, and the law has entrusted the administration of this criterion to the impartial conscience and judgment of jurors, who may be expected to act reasonably, intelligently and in harmony with the evidence.' " Quoting *Domann v. Pence*, 183 Kan. 135, 325 P.2d 321 (1958).

We find the facts support the amount of the verdict and, therefore, there is no evidence the verdict was rendered under the influence of passion and prejudice.

Appellants next argue the verdicts were contrary to the evidence.

We have held when a verdict is attacked on the ground it is contrary to the evidence, it is not the function of the court on appeal to weigh the evidence or pass on the credibility of the witnesses. If the evidence with all reasonable inferences to be

drawn therefrom, when considered in a light most favorable to the successful party below, will support the verdict, this court should not intervene. *Timsah v. General Motors Corp.,* 225 Kan. 305, Syl. ¶ 1, 591 P.2d 154 (1979).

Appellants contend the verdict is contrary to the physical evidence in that Hernandez' vehicle struck the left front bumper of the tractor, rather than the left rear wheels of the trailer, as testified to by appellees. Appellants also contend the gradual tire marks rolling onto the shoulder were indicative that Hernandez was attempting to pass, rather than, as he testified, attempting to get out of the way of Bartlett's truck. This, with other facts, appellants contend, is inconsistent with the finding of 90% negligence on Bartlett's part.

Appellees note that in opening and closing arguments, appellants' counsel told the jury that this was a case where the testimony of the two sides was irreconcilable. Due to these irreconcilable positions, appellants argued the jury would either have to believe one side or the other. As appellees note, the jury obviously believed the appellees' theory, rather than that of appellants.

There were conflicting theories and evidence presented at trial. The jury chose to believe appellees' theory and the evidence is not inconsistent with that theory. Thus, according to the required scope of review the verdict is upheld.

The final issue we must consider is appellants' contention that the trial court erred in refusing to require production of or make known to the court and jury the terms of the settlement between Ratterree and Hernandez.

Appellees notified the court and appellants they had settled their dispute prior to trial. However, the terms of the settlement were not disclosed. Appellants contend the terms of the settlement are that Hernandez would guarantee to Ratterree the payment of his insurance policy limits of $50,000 and would remain in the lawsuit and participate in the trial. Appellants further contend appellees agreed in their settlement that any money recovered by Ratterree from appellants over and above $150,000 would reduce Hernandez' obligation to Ratterree dollar for dollar regardless of the actual verdict returned against Hernandez.

Though the settlement terms are unknown, for purposes of this discussion we will assume appellants' allegations are true. Such settlements are not new to the law but this is a case of first

impression in Kansas. They have come to be known as "Mary Carter," "Gallagher" or "sliding scale" contracts. The names come from two well-known cases involving such settlements: *Booth v. Mary Carter Paint Co.*, 202 So. 2d 8 (Fla. Dist. App. 1967), and *City of Tucson v. Gallagher*, 108 Ariz. 140, 493 P.2d 1197 (1972). Such settlements usually involve the following scenario:

"One or more defendants secretly guarantee the plaintiff a specified recovery, which will be diminished or extinguished by any recovery secured from the other defendants. The agreeing defendants may remain parties to the lawsuit and, in some cases, may provide the plaintiff with an interest-free loan in the amount of the specified recovery, which is repayable solely from judgments or settlements ultimately obtained from nonagreeing defendants." Eubanks and Cocchiarella, *In Defense of "Mary Carter,"* 26 For the Defense 14, 15 (Feb. 1984).

In *Booth v. Mary Carter Paint Co.*, two fraternity pledges were blindfolded and left on a highway as part of an initiation ritual. Two southbound trucks belonging to Mary Carter Paint Co. came upon the boys and stopped, assuming they had been in an accident. Shortly thereafter, a northbound truck belonging to B. C. Willoughby arrived and stopped in the traffic lane opposite the Mary Carter trucks, blocking the traffic on the two-lane highway. Just then the plaintiff's wife, Elsie Booth, arrived at the scene, crashed her Volkswagen into the rear of the Willoughby truck and was killed instantly. (See 182 So. 2d 292 [Fla. Dist. App. 1966], for above facts.)

J. D. Booth brought a wrongful death action against Willoughby and Mary Carter, alleging both were negligent. Subsequently, prior to trial, Booth and Willoughby entered into a settlement agreement. It provided Willoughby's liability was limited to $12,500 with Willoughby remaining active in the suit until all issues of liability and damages were resolved between Booth and Mary Carter. In the event a joint verdict was returned against all defendants for more than $37,500, Booth agreed to enforce the judgment only against Mary Carter. If Mary Carter's liability did not reach $37,500, Willoughby agreed to make up the difference to $37,500, but in no case would its contribution exceed $12,500. If the jury returned a verdict for all defendants, then Willoughby would pay Booth $12,500. If the jury returned a verdict solely against Mary Carter for $37,500 or less, Willoughby would contribute $12,500. The agreement applied to a

final determination of the suit whether by jury verdict or settlement. The agreement and its terms were not to be revealed to the jury nor furnished to anyone else unless ordered by the court. 202 So. 2d 8.

A similar agreement was entered into in *City of Tucson v. Gallagher,* 108 Ariz. 140. There Gallagher was injured when the car in which she was a passenger fell into a deep washout in the road. She brought a negligence action against both the driver and the City of Tucson. The driver had insurance coverage to $10,000. Gallagher entered into a settlement agreement with the driver, giving her the option of taking $10,000 and releasing the driver. Until the option was exercised, the driver would remain in the case. Gallagher agreed if a judgment were obtained against the city for more than $10,000, she would not attempt to collect from the driver, but if the judgment were obtained against the city for less than $10,000, the driver would pay the difference up to $10,000.

In the instant case it was acknowledged there was a secret settlement on the eve of the trial. Appellants moved for discovery of that settlement in order to determine whether it might be a "Mary Carter" agreement and possibly thereby objectionable. The district judge denied the motion for discovery.

Appellants argue the failure to make the agreement known to the judge, opposing counsel, and the jury prejudiced appellants' right to a fair trial in that it affected the jury's ability to analyze the true posture of the parties and the weight and credibility to be given to the testimony of the witnesses, since the jurors were unaware that one of the "defendants" had an actual financial interest in plaintiff's obtaining a large verdict against the other defendant. It is further argued that, due to the jury's lack of knowledge of the agreement, the settling defendant in such cases can add greatly to the credibility of the plaintiff's position and enhance the plaintiff's chances of obtaining a large verdict against the nonsettling defendant.

Appellees argue this is not a "Mary Carter" agreement because such occur only in joint and several liability cases where one defendant can shift the entire liability to the other, which cannot occur in comparative fault cases.

Due to the possibility of prejudice arising from such secret "Mary Carter" agreements, the overwhelming majority of courts,

though approving such agreements, have required disclosure of the settlement terms to the parties and the court and, under certain circumstances, to the jury. See Alaska—*Breitkreutz v. Baker*, 514 P.2d 17 (Alaska 1973); Arizona—*Taylor v. DiRico*, 124 Ariz. 513, 606 P.2d 3 (1980); Arkansas—*Firestone Tire & Rubber Co. v. Little*, 276 Ark. 511, 639 S.W.2d 726 (1982); California—*Pellett v. Sonotone Corp.*, 26 Cal. 2d 705, 160 P.2d 783 (1945); Colorado—*Bashor v. Northland Ins.*, 29 Colo. App. 81, 480 P.2d 864 (1970), *aff'd* 177 Colo. 463, 494 P.2d 1292 (1972); Florida—*Ward v. Ochoa*, 284 So. 2d 385 (Fla. 1973); Maryland—*General Motors Corp. v. Lahocki*, 286 Md. 714, 410 A.2d 1039 (1980); Minnesota—*Johnson v. Moberg*, 334 N.W.2d 411 (Minn. 1983); Nebraska—*Hegarty v. Campbell Soup Co.*, 214 Neb. 716, 335 N.W.2d 758 (1983); New Hampshire—*Bedford School Dist. v. Caron Const. Co.*, 116 N.H. 800, 367 A.2d 1051 (1976); Oregon—*Grillo v. Burke's Paint Co.*, 275 Or. 421, 551 P.2d 449 (1976); Texas—*Bristol-Myers Co. v. Gonzales*, 561 S.W.2d 801 (Tex. 1978).

One court emphasized why disclosure of the terms of such agreements is so important:

"The search for the truth, in order to give justice to the litigants, is the primary duty of the courts. Secret agreements between plaintiffs and one or more of several multiple defendants can tend to mislead judges and juries, and border on collusion. To prevent such deception, we are compelled to hold that such agreements must be produced for examination before trial, when sought to be discovered under appropriate rules of procedure. If the agreement shows that the signing defendant will have his maximum liability reduced by increasing the liability of one or more co-defendants, such agreement should be admitted into evidence at trial upon the request of any other defendant who may stand to lose as a result of such agreement. If defendants not directly affected by such agreement move for severance because of possible prejudice to them, the Court shall exercise its sound discretion in granting or denying such motion." *Ward v. Ochoa*, 284 So. 2d at 387-88.

California believes so profoundly in the disclosure of such agreements that it has enacted a statute requiring disclosure of them to the court and the other parties. See Cal. Civ. Proc. Code § 877.5(b) (West 1980).

Not only has the failure to disclose the settlement to the court and the other parties been found to be error, but many times the failure to disclose the agreement to the jury has also been found to be reversible error. See *General Motors Corp. v. Lahocki*, 286 Md. at 728; *Hegarty v. Campbell Soup Co.*, 214 Neb. 716;

*General Motors Corp. v. Simmons,* 558 S.W.2d 855, 857-59 (Tex. 1977).

Each case, however, must be considered on its own facts, since the terms of settlements vary. Some settlements, although appearing to be "Mary Carter" agreements, because of the circumstances of the case will not actually result in aligning the plaintiff and one of the defendants. This type of agreement would therefore be acceptable. See, *e.g., Lahocki v. Contee Sand & Gravel Co.,* 41 Md. App. 579, 608-10, 398 A.2d 490 (1979), *rev'd on other grounds* 286 Md. 714, 410 A.2d 1039 (1980). In the instant case, however, we are unable to evaluate the settlement because we do not know its terms. Appellants maintain several events occurred at trial indicating Ratterree and Hernandez had secretly aligned themselves through the settlement agreement, rendering Hernandez' testimony no longer credible as a "defendant."

Appellants claim seven instances of prejudice. First, although Ratterree alleged Hernandez was negligent in the petition and in the pretrial order, at trial Ratterree said that Hernandez was not in the least bit negligent. Second, no objection was made by Ratterree to Hernandez' motion for directed verdict. In fact, Ratterree's attorney stated:

"If his directed verdict motion were good against us, does that mean that Mr. Hernandez wouldn't be compared for negligence purposes because that's the only basis upon which his motion could be valid? If there's a directed verdict against the plaintiff as against this defendant then he would not be comparable to Mr. Bartlett for negligence purposes. Furthermore so far as I'm concerned I suspect that I would just as soon that that be the case. It would be kind of unusual normally but under the present circumstances of it, if sustaining his motion would mean that Mr. Hernandez's fault wouldn't be compared I guess I don't oppose it . . . ."

Third, Hernandez' attorney misinformed the jury that Ratterree *had* to sue him because of the law of comparative negligence, even though Ratterree did not think that Hernandez was negligent. Fourth, Ratterree made no mention in opening statement of Hernandez' negligence, despite the pretrial order which specifically alleged negligence on the part of Hernandez by Ratterree. Fifth, in opening statement Hernandez made no comment about the validity of Ratterree's damage claims, even though he was being sued in the trial for three-quarters of a million dollars. Sixth, Hernandez did not cross-examine one of Ratterree's damage witnesses and only did limited cross-examination of another.

Seventh, Hernandez urged in closing that the jury adequately compensate *both* Hernandez and Ratterree and even commented on the extensiveness of Ratterree's damages.

Our examination of the record does not impress us with the change of positions of either Ratterree or Hernandez of which appellants complain. We recognize Ratterree and Hernandez are friends and were in the same vehicle which collided with Bartlett's truck, causing both of them great injury. Such a common experience forms a bond. That fact aligns them on the same side of the case in spite of their party designations. In addition, Hernandez filed a cross-claim against appellants. That position was taken from the beginning. Hernandez' statements consistently blame the accident on appellants. In the absence of a secret settlement, Ratterree and Hernandez had a common interest against appellants by virtue of Hernandez' cross-claim. To that extent the settlement in this case is not a classic "Mary Carter" agreement. However, the potential for injustice is so great from the use of secret settlement agreements in any tort action where there are multiple defendants, whether under joint and several liability or comparative fault principles, that we believe a disclosure rule should be adopted. Therefore, we hereby adopt this rule: When a settlement agreement is entered into between the plaintiff and one or more, but not all, alleged defendant tortfeasors, the parties entering into such agreement shall promptly inform the court in which the action is pending and the other parties to the action of the existence of the agreement and its terms. If the action is tried to a jury and a defendant who is a party to the agreement is a witness, the court shall, upon motion of a party, disclose the existence and content of the agreement to the jury unless the court finds in its discretion such disclosure to the jury will create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.

The disclosure of the settlement agreement to the jury herein required shall be no more than the court deems necessary to apprise the jury of the essential nature of the agreement and the possibility the agreement may bias the testimony of the parties who entered into the agreement. In no instance shall the amount of the settlement or any specific contingencies be disclosed to the jury, except the jury shall be apprised in general terms of the

financial interest in the outcome of the case of any defendant who is a party to such an agreement.

The judgment of the trial court is reversed and the case remanded with directions to grant a new trial.

SCHROEDER, C.J., concurs in the result.