**Robert G. SLUSHER, Jr. Plaintiff and Appellee,**

v.

**Todd Paul OSPITAL, by his personal representative John OSPITAL, and Kenneth W. Brooks, Defendants, Cross-Claimants and Appellees,**

**and**

**Curtis Campbell, Defendant and Appellant.**

**No. 19660.**

Supreme Court of Utah.

June 23, 1989.

Wendell E. Bennett, Salt Lake City, for defendant and appellant.

W. Scott Barrett, Logan, for plaintiff and appellee.

L. Rich Humpherys, Salt Lake City, for Ospital.

ORME, Court of Appeals Judge:

Curtis Campbell appeals from adverse judgments entered against him in this multiparty case arising from a tragic highway accident. The appeal is focused exclusively on the trial court's handling of a settlement entered into, shortly before trial, between plaintiff and one defendant. We conclude that the court erred in not disclosing the settlement to the jury. However, as we are not persuaded that this error was prejudicial, we affirm.

## FACTS

Plaintiff Robert G. Slusher, Jr., was traveling in a six-van caravan on a two-lane highway through the Dry Lake area of Sardine Canyon in Cache County, Utah. Slusher was the driver of the last van. Campbell, who had been following the cara-

van, attempted to pass—or had just passed—all six vans. Todd Ospital, the driver of a small car coming the opposite direction, swerved onto the shoulder of the road, allegedly in an attempt to avoid Campbell. Ospital lost control of his vehicle and collided head-on with Slusher. Campbell's vehicle was unscathed. The cause of the collision was hotly disputed, with contradictory testimony concerning the speed of the Ospital and Campbell vehicles, whether Campbell had completely passed the caravan at the time Ospital lost control, and even whether another car which had passed the caravan might have precipitated Ospital's maneuvering.

Slusher was seriously injured in the collision and sued defendants for damages.[1] Ospital was killed in the collision, and his estate cross-claimed against Campbell on a negligence theory. Campbell cross-claimed against Ospital for contribution.

Prior to trial, Slusher's claim against Ospital's estate was settled for $65,000. The agreement did not affect Slusher's claim against Campbell, nor did it affect Ospital's cross-claim against Campbell.[2] Two days before trial, Campbell discovered that the settlement had been reached, although he had apparently been aware for several months that Ospital's estate was attempting to settle with Slusher. At the trial's outset, Campbell moved the court to do at least one of the following: (1) invalidate the settlement on public policy grounds, (2) bifurcate the proceeding so there would be separate trials on Slusher's complaint and Ospital's cross-claim, or (3) admit the settlement agreement into evidence. Campbell argued that Slusher and Ospital now had every incentive to show that Campbell was totally at fault, posing the risk of collusion at Campbell's expense. Accordingly, Campbell argued, the jury should be advised that Ospital and Slusher were no longer actually adversaries.

The trial court denied Campbell's requests. The court stated that advising the jury of the settlement would "place the jury in a position of looking at the agreement as an admission by Ospital of negligence and liability." Since the settlement was not an admission of negligence but merely an attempt to reduce the possible risk of a larger award, the court concluded that Ospital would be unduly prejudiced if evidence of the settlement were admitted.

The jury, kept ignorant of the settlement, returned a verdict against Campbell, finding him 100 percent responsible on both Slusher's claim and Ospital's cross-claim. Pursuant to the jury's verdicts, the court entered judgment in favor of Slusher for $200,000 and in favor of Ospital's estate for $50,849. Slusher's judgment was reduced by $65,000, the amount he received from Ospital in settlement. *See* note 2, *supra.*

On appeal, Campbell assails the settlement as a *Mary Carter* agreement and contends that the trial court erred in not granting him one of the three remedies he requested. We first consider the contention that the settlement agreement is properly classified as a *Mary Carter* agreement.

## *MARY CARTER* AGREEMENTS

As indicated, the terms of the settlement agreement included a provision requiring Ospital's estate to pay Slusher $65,000. However, Ospital's estate remained in the case so it could pursue its cross-claim against Campbell. Campbell contends that such an agreement changed the adversarial position of the agreeing parties and provided an incentive for them to collude against him. Campbell claims that this type of an agreement is a *Mary Carter* agreement and that while such agreements should per-

1. Defendant Kenneth W. Brooks was the owner of the vehicle Ospital was driving. However, he was dismissed early in the course of the action and is not a party to this appeal.

2. The agreement, in contemplation of then-applicable law, recognized that any judgment by Slusher against Campbell would be reduced by the settlement amount and likewise mooted Campbell's claim for contribution against Ospital by providing for an appropriate adjustment in any judgment entered in favor of Slusher against Campbell. *See* Utah Code Ann. §§ 78-27-42, -43 (1977) (repealed by 1986 Utah Laws ch. 199, §§ 6, 7).

haps be invalidated as against public policy, at a minimum, evidence of such agreements should be admitted for consideration by the jury. In this way, the jury can better assess the nature of the testimony offered by the agreeing parties, knowing that there now exists an incentive on their part to shift as much blame as possible onto their common adversary.

There is a legitimate basis for Campbell's concern. Initially, Slusher was motivated to show himself to be free of negligence, but he had no particular stake in the allocation of liability between defendants. However, after the settlement with Ospital's estate, Slusher had every incentive to characterize Campbell as solely responsible and exclusively liable. Ospital's estate, of course, wanted to focus responsibility on Campbell all along, but with the settlement, the estate had a motivated ally in Slusher. Although there is no evidence of fabricated testimony in the record before us, the potential for prejudice clearly existed, and Campbell argues that had the settlement agreement been disclosed to the jury, it may well have rendered a different verdict concerning the allocation of liability between Campbell and Ospital.

■ It is against this background that Campbell condemns the settlement as a *Mary Carter* agreement. The term derives from a 1967 Florida case, *Booth v. Mary Carter Paint Co.,* 202 So.2d 8 (Fla. Ct.App.1967), *overruled in part by Ward v. Ochoa,* 284 So.2d 385, 388 (Fla.1973),[3] upholding the validity and nondisclosure of a secret agreement that limited the maximum liability of two out of three defendants. A classic *Mary Carter* agreement[4]

is a settlement accord with these features: (1) it limits the liability of the agreeing defendant, who remains a party to a pending action; (2) it is withheld from the nonsettling parties and/or judge and jury; and (3) it guarantees to the plaintiff a minimum recovery, notwithstanding the fact that the plaintiff may not recover a judgment against the agreeing defendant or that the verdict may be less than that specified in the agreement. *General Motors Corp. v. Lahocki,* 286 Md. 714, 720–23, 410 A.2d 1039, 1042–43 (Ct.App.1980).

The notoriety surrounding *Mary Carter* agreements has increased in the last twenty years with the growing use of such agreements as a settlement device.[5] Entman, *Mary Carter Agreements: An Assessment of Attempted Solutions,* 38 U.Fla.L.Rev. 521, 522 (1986). The perceived evils engendered by a *Mary Carter* agreement include undue prejudice against the nonsettling defendant, and therefore denial of a fair trial, and collusion among the settling defendants and the plaintiff. The most egregious characteristic of the *Mary Carter* agreement is secrecy:

> Secrecy is the essence of [a *Mary Carter* agreement], because the court or jury as trier of the facts, if apprised of this, would likely weigh differently the testimony and conduct of the signing defendant as related to the non-signing defendants. By painting a gruesome testimonial picture of the other defendant's misconduct or, in some cases, by admissions against himself and the other defendants, he could diminish or eliminate his own liability by use of the secret "Mary Carter Agreement."

---

**3.** The term *"Mary Carter* agreement" was actually coined in *Maule Industries, Inc. v. Roundtree,* 264 So.2d 445 (Fla.Ct.App.1972), *modified,* 284 So.2d 389, 390–91 (Fla.1973).

**4.** Several courts have attempted to define the traditional or classic *Mary Carter* agreement. One court has even gone so far as to suggest requisite elements of a *Mary Carter* agreement. *See Cox v. Kelsey–Hayes Co.,* 594 P.2d 354 (Okla. 1979). However, the *Cox* court also suggested that the "number of variations upon such agreements is limited only by the ingenuity of the mind of man." *Id.* at 357 (footnote omitted).

**5.** *Mary Carter* agreements have received considerable scholarly attention. Two articles are cited in the body of this opinion. There are many others. *See, e.g.,* Note, *"Mary Carter" Limitation on Liability Agreements Between Adversary Parties: A Painted Lady is Exposed,* 28 Univ. Miami L.Rev. 988 (1974); Note, *The Mary Carter Agreement—Solving the Problems of Collusive Settlements in Joint Tort Actions,* 47 So.Cal.L.Rev. 1393 (1974); Note, *Mary Carter Agreements: A Viable Means of Settlement?,* 14 Tulsa L.J. 744 (1979); Comment, *Mary Carter Agreements: Unfair and Unnecessary,* 32 S.W.L.J. 780 (1978).

*Ward,* 284 So.2d at 387. Such factors obviously tend to undermine the adversarial nature of a trial proceeding.

Ospital and Slusher argue that the settlement agreement between them was not a *Mary Carter* agreement and that it did not have any of the prejudicial effects of such agreements. They argue that the element of secrecy was not present, as Campbell had been informed by Ospital of the likelihood of settlement and in fact learned of the settlement before the trial. The settlement was then disclosed to the trial court. Moreover, this particular settlement was for a fixed sum and fully compromised Slusher's claim against Ospital. Accordingly, it is not a *Mary Carter* agreement in a technical sense.[6] We think this is largely irrelevant, however, to the present case. The fact that the agreement might influence testimony but was kept secret from the jury is enough to trigger legitimate concern about whether Campbell received a fair trial.

## VALIDITY OF AGREEMENT AND BIFURCATION

As noted, Campbell made three alternative requests to the trial court in response to his discovery of the settlement agreement shortly before trial: (1) to bifurcate the proceeding; (2) to void the agreement as contrary to public policy; or (3) to admit the settlement agreement into evidence so that the jury could more fairly weigh the testimony of the witnesses. We agree with the trial court's refusal to void the agreement or to bifurcate the proceeding.

■ Of course, trial courts enjoy considerable discretion in deciding bifurcation and consolidation requests under rule 42 of the Utah Rules of Civil Procedure. *See, e.g., Coleman v. Dillman,* 624 P.2d 713, 716 (Utah 1981) (bifurcation under rule 42 may be accomplished for the convenience and at the discretion of the trial court); *Raggenbuck v. Suhrmann,* 7 Utah 2d 327, 329, 325 P.2d 258, 259 (1958) (absent prejudice to a litigant, the trial court has discretion to consolidate matters for trial); *see also* 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2392 (1971) (appellate court leaves discretion to trial court in bifurcating trials). Bifurcation was properly refused in this case because "it is imperative that the issue of proportionate fault should be litigated between all joint tort-feasors in the same action and resolved by the same trier of the issues of fact." *Madsen v. Salt Lake City School Bd.,* 645 P.2d 658, 663 (Utah 1982); *see also* C. Wright & A. Miller, *Federal Practice and Procedure* § 2388, at 281 (1971) (If "separate trial of an issue will involve extensive proof and substantially the same facts as the other issues, or if any saving in time and expense is wholly speculative, a separate trial will be denied." (footnote omitted)).

■ Nor is the agreement void as against public policy. "The public policy is to encourage settlements." *Lahocki,* 286 Md. at 727, 410 A.2d at 1046; *accord, Alvin G. Rhodes Pump Sales v. Industrial Comm'n,* 681 P.2d 1244, 1248 (Utah 1984); *Rio Algom Corp. v. Jimco Ltd.,* 618 P.2d 497, 506 (Utah 1980). This agreement, which basically provided nothing more than that one party pay another a fixed sum in full satisfaction of the other's claim, did not contain the objectionable features which occasionally prompt courts to invalidate secretive settlement agreements. *See, e.g., Lum v. Stinnett,* 87 Nev. 402, 488 P.2d 347 (1971).

However, we disagree with the trial court's decision to keep the jury totally ignorant of the changed adversarial positions caused by the settlement. A review of recent cases suggests a more appropriate handling of the issue.

## DISCLOSURE TO JURY: CURRENT CASE LAW

The current approach is to validate *Mary Carter* and similar agreements, so long as

---

6. We accordingly have no occasion in the instant case to determine the status of *true Mary Carter* agreements in Utah. Such agreements pose additional problems, and mere disclosure to the fact finder may not be an adequate solution. *See* Entmann, *Mary Carter Agreements: An Assessment of Attempted Solutions,* 38 U.Fla. L.Rev. 521, 577–78 (1986).

they are not void as against public policy,[7] but to require that they be fully disclosed to the court and, "under certain circumstances, to the jury." *Ratterree v. Bartlett*, 238 Kan. 11, 27, 707 P.2d 1063, 1074 (1985); *see* R. Eubanks & A. Cocchiarella, *In Defense of "Mary Carter,"* 26 For The Defense 14, 22–23 (1984).

The Florida Supreme Court adopted a similar position in *Ward*, 284 So.2d 385, when it overruled *Booth v. Mary Carter*. The court stated:

> The search for the truth, in order to give justice to the litigants, is the primary duty of the courts. Secret agreements between plaintiffs and one or more of several multiple defendants can tend to mislead judges and juries, and border on collusion. To prevent such deception, we are compelled to hold that such agreements must be produced for examination before trial, when sought to be discovered under appropriate rules of procedure.

*Id.* at 387.

In *Mustang Equipment, Inc. v. Welch*, 115 Ariz. 206, 210–11, 564 P.2d 895, 900 (1977) (en banc), the Arizona Supreme Court adopted a rule which required disclosure of "Gallagher agreements" to counsel and the court.[8] The court stated that it is a better policy to require pretrial disclosure of such agreements to the court and to all concerned parties. "[W]e cannot condone secret agreements between a plaintiff and defendant which, by their very secretiveness, may tend to encourage wrongdoing and which, at the least, may tend to lessen the public's confidence in our adversary system." *Id.* at 211, 564 P.2d at 900.

In *Johnson v. Moberg*, 334 N.W.2d 411, 415 (Minn.1983), the Minnesota court held that a *Mary Carter* agreement could affect the motivation of the parties and the credi-

bility of the witnesses and therefore the settlement must be brought into the open so trial can proceed in a fair manner. *Id.*

In California, the legislature has gone so far as to codify that state's rule regarding admission of "sliding scale recovery" agreements. The California statute requires that the court be informed of the agreement and that existence of the agreement, as well as its terms and provisions, be disclosed to the jury. *See* R. Eubanks & A. Cocchiarella, *In Defense of "Mary Carter,"* 26 For The Defense 14, 23 (1984).

## DISCLOSURE TO JURY: POSSIBLE PROBLEMS

While disclosure may be the most commonly accepted approach to *Mary Carter* and related agreements, it is not without difficulty. Such agreements often contain self-serving statements and include the amount of the settlement, both of which could prejudice the nonagreeing defendant should the agreements be disclosed. *See Lahocki*, 286 Md. at 727, 410 A.2d at 1046. Furthermore, there are at least two generally recognized problems that may arise because of the potential for improper jury inferences. First, the jury may draw improper conclusions regarding the liability of the parties who settle. The jury may infer that the settling defendant must be the main culprit or he or she would not have settled. *See Slayton v. Ford Motor Co.*, 140 Vt. 27, 28, 435 A.2d 946, 947 (1981). Or, as is just as likely in this case, it may see the settling defendant as conciliatory and responsible and the nonsettling defendant as recalcitrant and irresponsible. We believe that such concerns can largely be ameliorated through an appropriate instruction to the jury.[9]

Second, if told of a settlement the jury may be more likely to assume the availabili-

---

**7.** For an example of an especially unsavory agreement, held to be void because it required unethical conduct, see *Lum*, 87 Nev. 402, 488 P.2d 347.

**8.** *Gallagher* agreements and *Mary Carter* agreements are virtually synonymous. The term "Gallagher" stems from *City of Tucson v. Gallagher*, 108 Ariz. 140, 493 P.2d 1197 (1972).

**9.** Such an instruction would emphasize that the settlement and resulting change in the adversarial alignment of the parties could be considered only in evaluating the credibility of testimony and not on the question of liability.

ty of insurance coverage. *See Lum,* 87 Nev. at 411, 488 P.2d at 352 (counsel acknowledged agreement might prejudice jury because of references to insurance); *cf. Cox,* 594 P.2d at 359 (refusal to allow cross-examination of witness as to settlement with an insurer is error even though it incidentally discloses existence of insurance). This strikes us as being of only minimal concern. "[T]here is considerable authority to the effect that jurors today assume the presence of insurance." 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2388, at 282 (1971). That jurors in Utah make such assumptions, at least in automobile accident cases, is especially likely in view of the virtual requirement that all vehicles registered in this state be insured. *See, e.g., Barber v. Farmers Ins. Exch.,* 751 P.2d 248, 249 (Utah Ct.App.1988).

Ospital and Slusher additionally argue in this case that Utah Code Ann. §§ 78–27–29 and –30 (1977) (superseded) [10] precluded introduction of the settlement agreement. Section 78–27–30 provided, with our emphasis: "No settlement, partial settlement or voluntary payment under section 78–27–29 shall be admissible in any action *as evidence* prior to judgment." The implication is that settlement and payment might nonetheless come in other than as evidence, such as for impeachment purposes. This conclusion is supported by the explicit reference in section 78–27–30 to the immediately preceding section. Section 78–27–29 provided as follows, with our emphasis:

No settlement, partial settlement or voluntary payment of a claim against any party *shall be construed as an admission of liability* by that party or his insurer with respect to any claim arising from the same event or set of facts, whether that payment or settlement is made by the party, an insurer or any other person on behalf of the party or the insurer.

Taken together, the two statutes resulted in a rule not unlike Utah Rule of Evidence 408, now in effect.[11] In other words, they precluded introduction of the settlement for the purpose of establishing liability but not for purposes relating to credibility.[12]

Finally, Ospital and Slusher contend that Campbell should not be heard to complain about the settlement because he actually *benefited* from the settlement agreement. The jury found that Campbell was 100 percent at fault and assessed damages of $200,000 in Slusher's favor. Under the statutory scheme then in effect, *see* note 2, *supra,* the nonsettling joint tort-feasor was credited for any settlement made to the injured party by another joint tort-feasor.[13]

10. These sections were superseded by the 1983 enactment of rule 409 of the Utah Rules of Evidence, *see* Utah Code Ann. §§ 78–27–29 to –31 (1987) compiler's notes; Utah R.Evid. 409 advisory committee note, and it would seem, rule 408. *See also* Utah R.Evid. preliminary note (repealing effect of rules upon inconsistent statutes); Utah R.Evid. 101 advisory committee note (effect of rules).

11. Rule 408 provides that evidence of settlement "is not admissible to prove liability for or invalidity of the claim or its amount." The rule expressly provides that such evidence is not excluded when it is offered "for another purpose, such as proving bias or prejudice of a witness...."

12. Although the parties have not developed the issue, we note that it is doubtful that these statutory provisions were applicable in any event. As observed in note 10, *supra,* these sections were superseded by the Utah Rules of Evidence, which were promulgated subsequent to the accident giving rise to this dispute but prior to trial. Insofar as the subject of these sections, and the corresponding evidence rules subsequently promulgated, are deemed procedural in nature rather than substantive, *see, e.g., Stephens v. Henderson,* 741 P.2d 952, 953–54 (Utah 1987); *Docutel Olivetti Corp. v. Dick Brady Systems, Inc.,* 731 P.2d 475, 478 (Utah 1986), the Rules of Evidence, specifically rule 408, would control to the exclusion of sections 78–27–29 and –30. *See* note 11, *supra,* and accompanying text. Although not all evidentiary rules are necessarily merely procedural, *cf.* R. Boyce and E. Kimball, *Utah Rules of Evidence 1983,* 1985 Utah L.Rev. 63, 64–66, those relevant to this analysis seem to be. If, as therefore appears likely, rule 408 applied to the trial in this case, it even more clearly supports the conclusion we reach.

13. The statutory scheme has since been changed. Under Utah Code Ann. § 78–27–40 (1987), defendants are no longer entitled to contribution but are liable solely for that proportion of fault attributed to them. Section 78–27–40 provides:

Without the settlement, Campbell would be liable for 100 percent of $200,000; with the settlement, he was 100 percent responsible for $200,000 less $65,000. This contention misses the point. Campbell contends that had the jury been let in on the secret, it might have evaluated the testimony and arguments differently and apportioned responsibility differently. Taking the extreme case, if the "enlightened" jury had found Ospital instead of Campbell to be 100 percent responsible, Campbell would have no liability whatsoever to Slusher.

## DISCLOSURE TO JURY: BALANCED APPROACH

■ We believe the position of the Kansas Supreme Court in *Ratterree*, 238 Kan. at 27–30, 707 P.2d at 1074–76, reflects a modern view representative of the approach which should ordinarily be taken. Under this approach, where an injured plaintiff and one or more, but not all, defendant tort-feasors enter into a settlement agreement, the parties must promptly inform the court and the other parties to the action of the existence of the agreement and of its terms. Where the action is tried by a jury, the court shall, upon motion of a party, disclose the existence and basic content of the agreement to the jury *unless* the court finds that, on facts particular to the case, such disclosure will create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. *See id.*

The court should also determine whether explanation is sufficient, as we believe it would have been in this case, or whether admission of the document into evidence is appropriate and, if so, which portions of the agreement should properly be omitted. We believe instances would be rare when the amount of the settlement should be disclosed. However, the jury should be informed of the changed financial interest of the parties concerned and the realigned positions of the litigants. *See id.; see also* note 9, *supra.*

"[T]he potential for injustice is so great from the use of secret settlement agreements in any tort action where there are multiple defendants, whether under joint and several liability or comparative fault principles, that we believe a disclosure rule should be adopted." *Ratterree*, 238 Kan. at 29, 707 P.2d at 1076. Because it has not been shown that appropriate disclosure of the settlement in this case would have led to a substantial danger of undue prejudice, of confusing the issues, or of misleading the jury, we believe the trial court erred in not disclosing the settlement to the jury.

## LACK OF PREJUDICE

■ Of course, the trial court's error does not necessitate reversal and the accompanying need for a costly and burdensome new trial if the error was harmless, i.e., if "there is no reasonable likelihood that the error affected the outcome of the proceedings." *State v. Verde*, 770 P.2d 116, 120 (Utah 1989); *see, e.g., State v. Knight*, 734 P.2d 913, 919 (Utah 1987); *Belden v. Dalbo, Inc.*, 752 P.2d 1317, 1319, 1321 (Utah Ct.App.1988); *see also* Utah R. Evid. 103(a); Utah R.Civ.P. 61. We conclude that the court's error was harmless given the totality of circumstances in which it was made.

First, well in advance of the settlement, Slusher's deposition was taken. Campbell draws to our attention no significant instance of discrepancy between Slusher's presettlement deposition testimony and his post-settlement trial testimony. Our review of his trial testimony indicates that the deposition was referred to in cross-examination but no material inconsistency was shown. The deposition served as a

---

[T]he maximum amount for which a defendant may be liable to any person seeking recovery is that percentage or proportion of the damages equivalent to the percentage or proportion of fault attributed to that defendant. No defendant is entitled to contribution from any other person.

*See also* Utah Code Ann. § 78–27–42 (1987) (release to one defendant does not discharge other defendant unless release so provides). If anything, concerns regarding secret settlement agreements apply more strongly under the present statutory scheme since joint tort-feasors have a more direct financial incentive to shift blame to the other defendants.

strong check on any inclination Slusher might otherwise have had to fabricate or tailor his testimony to accommodate any altered adversarial positions which existed as of trial.

Second, counsel's statements and arguments to the jury helped avoid prejudice. Slusher's counsel stated that "if anyone was at fault in this accident it wasn't Mr. Slusher, and either one or both of the other defendants are responsible and should respond in damages." Ospital's attorney characterized Slusher's position as, "[H]e feels both parties are responsible for the accident." Campbell's attorney, while precluded from expressly referring to the settlement, nonetheless argued to the jury that the other parties obviously had an arrangement of some sort to the effect, "I'll help you and you help me and let's stick Campbell."

Third, the trial court, who, like Campbell, was surprised by the settlement and articulated to counsel doubts about how best to proceed, permitted trial to go forward with the expressed attitude that he would watch carefully what developed and consider by way of post-trial motion any problems that might actually arise by reason of his decision to keep the settlement out.

Fourth, and most important, is the trial court's conclusion made in response to just such post-trial motions. From his advantaged position of having presided over the trial knowing full well of the settlement and the potential problems it presented, the court concluded:

> As to any collusion, this court was present and observed the whole trial, observed no collusion between attorneys for Ospital and Slusher. In fact, Counsel for Slusher questioned all witnesses of both Campbell and Ospital as though adversary to his position that Slusher was not negligent, had no liability, and that he didn't know who was liable but it had to be one or the other defendant or both.

Cf. Sequoia Mfg. Co. v. Halec Constr. Co., 117 Ariz. 11, 24, 570 P.2d 782, 795 (Ct. App.1977) ("After observing the conduct of all counsel, their demeanor, their witnesses, and the overall atmosphere of the court-

room, the trial judge determined it unnecessary in this case to disclose the agreement to the jury. In an instance such as this, we invest the trial court with considerable discretion. We find no abuse of discretion."). Most tellingly, notwithstanding his own knowledge of the settlement and its possible ramifications on credibility, the trial court stated:

> This Court agrees with the jury findings and would have so found had there not been a jury. The only disagreement the Court would have had if he himself [had] participated in the jury results would be that the amount of damages [was] too small.

Accordingly, we are convinced that the disclosure of the settlement agreement to the jury would not have had any effect on the outcome of trial. The court's error in not disclosing the settlement therefore proves to have been harmless. The judgments appealed from are accordingly affirmed.

HALL, C.J., HOWE, Associate C.J., and DURHAM and ZIMMERMAN, JJ., concur.

STEWART, J., does not participate herein; Gregory K. Orme, Court of Appeals Judge, sat.