OPINION.
{¶ 1} This medical malpractice case involves two appeals and a cross-appeal from the judgment of the Hamilton County Court of Common Pleas following a jury trial, at the conclusion of which the jury returned a verdict against Appellant, Joel Korelitz, M.D., in the amount of $775, 000.00, plus costs. Korelitz appeals from the trial court's (1) Entry granting the Motion for Prejudgment Interest of Appellee, Michael Hodesh; (2) the Judgment Entry entered on July 26, 2006; (3) the Entry granting Hodesh's Motion for Bill of Costs; and (4) the Entry denying Korelitz's Motions for a New Trial, Remittitur, Set-off and to Revoke the Confidential Agreement. Korelitz's insurance company, Pro Assurance, Inc., intervened in the case after Hodesh moved for prejudgment interest. Pro Assurance has filed its own appeal from the trial court's Entry awarding Hodesh prejudgment interest in the amount of $348, 750.00.
 {¶ 2} Hodesh cross-appeals, contesting the trial court's decision to grant a directed verdict against Hodesh as to his claims of spoliation of evidence, intentional destruction of evidence, fraudulent concealment and punitive damages.
 I. The Facts {¶ 3} On December 26, 2000, Michael Hodesh underwent abdominal surgery for diverticulitis at Jewish Hospital in Cincinnati, Ohio. Performing the surgery was Appellant, Joel Korelitz, M.D. Korelitz was assisted by Jeffrey Mathisen, M.D., a surgical resident at Jewish Hospital; Tari Berke, a scrub nurse; and Sherry Murphy, a circulating nurse.
 {¶ 4} During the surgery, Korelitz used an unspecified number of 18" x 12" surgical *Page 3 
towels to pack Hodesh's small bowel in order to visualize the colon. Testimony was presented at trial that indicated such use of surgical towels was not common practice, as towels, at that time, were rarely included in nurses' procedure for counting instruments and supplies placed on surgical trays and used during operations. However, Korelitz routinely used the towels for this purpose.
 {¶ 5} The parties do not dispute that one of these towels was left inside of Hodesh's abdomen at the conclusion of the surgery. Rather, conflict arose because neither the nurses nor Korelitz would assume full responsibility for keeping track of the surgical towels that were used. Gerald Bechamps, M.D., an expert witness retained by Jewish Hospital, testified via video deposition during the plaintiffs case-in-chief that it is the responsibility of the surgeon as the head of the operating room team to tell the nurses that he or she is placing an item into the abdomen of a patient, so that the item may be accounted for and removed before the surgery is completed. Bechamps also asserted that the nurses have a duty to make a notation of any objects placed inside of a patient's abdomen during surgery that are not part of the routine counting procedure, but that this duty arises only after the surgeon has alerted them that he or she has actually placed the objects in the patient. To the contrary, Korelitz's expert witness, Stephan Myers, M.D., testified that it is always the expectation of the surgeon that the nurses in the operating room will count all items that go into and are taken out of a patient's abdomen. This count must occur at the time the nurse hands the surgeon the item. According to Myers, the expectation results from the surgeon's complete attention being focused on the procedure, not on accounting for different devices. Furthermore, Myers contended that Jewish Hospital's counting policy lacked the necessary precision to advise nurses of what to do with towels used during a *Page 4 
surgery.
 {¶ 6} Hodesh was released from the hospital on January 5, 2001. For the next 20 days, symptoms associated with the surgery persisted, including fever, severe abdominal pain and uncontrollable bowel movements. On January 18, 2001, Hodesh went to Korelitz's office, where x-rays were taken of his upper gastrointestinal tract. The surgical towel was not identified at that time. Instead, Korelitz concluded that fecal matter had amassed near Hodesh's colon where the prior surgery had been performed. Due to ongoing pain and discomfort, Hodesh was re-admitted into Jewish Hospital on January 26, 2001. Stuart Hodesh, the appellee's brother, signed the admission papers as the appellee's power of attorney.
 {¶ 7} Upon admission, the surgical resident, Mathisen, took x-rays of Hodesh's abdomen as part of a preliminary examination. Mathisen opined that the films showed a small bowel obstruction and evidence of a foreign body in the abdomen. Moreover, the radiologist's diagnosis indicated that the "[f]indings are suspicious for intra-abdominal radiopaque foreign bodies possibly representing intra-abdominal towels or sponges." (Tr. at 518.) When Mathisen informed him of the findings, Korelitz reviewed the x-rays with the radiologist, comparing those with the films taken on January 18, 2001. Based on their review, the radiologist included an addendum to his report, providing that the "hazy density [in the x-ray] most likely represents a peculiar configuration of stool present in the right colon." (Tr. at 517.)
 {¶ 8} Thereafter, Korelitz performed a second surgery on Hodesh, which was identified as an exploratory laparotomy. During this surgery, Korelitz located and extracted the retained *Page 5 
surgical towel from the center of an abscess cavity filled with pus. Despite the operative report prepared by Korelitz indicating that a "fragment of old towel" was identified and removed from Hodesh's abdomen, Korelitz admitted at trial that the whole surgical towel was removed, although it was compacted. (Tr. at 526.)
 {¶ 9} Following its removal, Korelitz ordered that the towel be discarded. According to Carolyn Davis, a registered nurse at Jewish Hospital and the charge nurse at the time of Hodesh's second surgery, the proper procedure would have been to send the towel to the pathology lab for examination. Davis further testified, however, that commonly a nurse would not send a specimen to pathology if told not to by the participating surgeon. In such an event, the nurses are required to record appropriate documentation of the item pursuant to Jewish Hospital policy. This did not occur. In addition, Korelitz testified that it was unnecessary to send the towel to the pathology lab because its description was not at issue and the fact that it was the origin of Hodesh's abdominal infection was not in dispute.
 {¶ 10} At the conclusion of the surgery, Korelitz informed Stuart Hodesh that he had removed a surgical towel from his brother's abdomen and that this towel had been the source of Hodesh's infection and coinciding abdominal pain. According to Korelitz, Stuart Hodesh requested that he keep this information from his brother because of Michael Hodesh's unstable mental condition. Korelitz complied. He further testified that he recounted the results of the surgery and the conversation with Stuart Hodesh to Bruce Greenberg, M.D., Hodesh's general practitioner.
 {¶ 11} A drainage tube was inserted into Hodesh's abdomen on January 31, 2001. Its purpose was to remove excess pus as a result of the infection. The tube remained inside of *Page 6 
Hodesh for an additional ten days.
 {¶ 12} In July 2001, Hodesh underwent surgery for an incisional hernia. Testimony from the treating physician, Martin B. Popp, M.D., indicated that the hernia was an "infectious complication" related "to the whole towel and the whole inflammatory process." (Popp Dep. at 12-13.)
 {¶ 13} Hodesh filed a medical malpractice action in January 2002 against Korelitz, his general surgeon; Cincinnati General Surgeons, Inc., Korelitz's practice group; and Jewish Hospital and the Health Alliance of Greater Cincinnati (collectively, "Jewish Hospital"). He subsequently amended his complaint to include claims of spoliation of evidence, destruction of evidence, fraud and punitive damages.
 {¶ 14} This matter proceeded to trial in July 2006. On the day prior to trial, Korelitz's attorney became aware that Jewish Hospital and Hodesh had entered into a partial settlement agreement — his concern was that the parties had entered into a Mary Carter agreement, whereby Jewish Hospital aligned itself with Hodesh in exchange for a release from judgment. See Booth v. Mary Carter Paint Co.
(Fla.App.1967), 202 So.2d. 8, overruled by Ward v. Ochoa (Fla. 1973),284 So.2d 385. Defense counsel's concern was entered into the record on the day of trial. According to the trial court, there was no evidence of collusion between Jewish Hospital and Hodesh for it to determine that the agreement was a Mary Carter agreement and, thus, should be disclosed to the jury. Instead, the court determined it to be a high/low agreement and ordered that it remain confidential and sealed until the end of the trial. It is important to note that the trial court did not examine the instrument at this time. At the conclusion of the trial, the parties agreed to have confidentiality of the agreement lifted. *Page 7 {¶ 15} After a week-long trial, the jury found that Korelitz, alone, was negligent for failing to examine Hodesh's abdominal cavity and remove the surgical towel before the incision was closed. As a result, the jury returned a verdict against Korelitz in the amount of $775, 000.00. At the end of Hodesh's case-in-chief, the trial court had directed out his claims of spoliation of the evidence, destruction of the evidence, fraud and punitive damages, in addition to any allegations regarding informed consent.
 {¶ 16} Post-trial, Korelitz moved for a new trial, or in the alternative, for remittitur, for a set-off, and for revoking the confidentiality order of the court. Each motion was subsequently denied. At the same time, Hodesh moved for prejudgment interest. After Hodesh filed his motion, Korelitz's medical malpractice insurer, Pro Assurance, obtained permission to intervene to challenge prejudgment interest. The trial court subsequently granted prejudgment interest, following a hearing in February 2007, in the amount of $348, 750.00 on the entire verdict of $775, 000.00.
 {¶ 17} In September 2006, Jewish Hospital was dismissed with prejudice in accordance with the terms of its agreement with Hodesh. Additionally, Jewish Hospital paid Hodesh $175, 000.00, also per the agreement("If Korelitz or his insurance carrier do not pay the verdict withinthirty-days from the judgment in the trial court, Jewish will pay $175,000.00 to Plaintiff; and, Hodesh will forego any appeal against Jewishand provide a dismissal of Jewish with prejudice").
 {¶ 18} Korelitz filed a timely notice of appeal with this Court, and he has assigned the *Page 8 
following errors for our review:
 {¶ 19} I. "THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANTS
BY PERMITTING HODESH AND JEWISH HOSPITAL TO MAINTAIN A SECRET `MARY CARTER AGREEMENT.'"
 {¶ 20} II. "THE TRIAL COURT ERRED TO THE PREJUDICE OF THE APPELLANTS BY FAILING TO APPLY A SET-OFF"
 {¶ 21} III. "THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANTS BY FAILING TO BIFURCATE THE ALLEGATIONS OF INTENTIONAL MISCONDUCT."
 {¶ 22} IV. "THE TRIAL COURT ERRED TO THE PREJUDICE OF THE APPELLANTS BY PRECLUDING CROSS-EXAMINATION OF HODESH ON PRIOR, INCONSISTENT, SWORN STATEMENTS."
 {¶ 23} V. "THE TRIAL COURT ERRED TO THE PREJUDICE OF THE APPELLANTS IN DENYING THE MOTION FOR DIRECTED VERDICT ON ALLOWING HODESH TO CLAIM, AND INSTRUCTING THE JURY ON ALLEGED LOSS OF BUSINESS OPPORTUNITIES CLAIM"
 {¶ 24} VI. "THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN DENYING THE APPELLANTS' MOTION FOR A NEW TRIAL WHEN THEY WERE DEPRIVED OF A FAIR TRIAL."
 {¶ 25} VII. "THE TRIAL COURT ERRED TO THE PREJUDICE OF THE APPELLANTS BY CONSIDERING AND THEN GRANTING HODESH'S MOTION FOR PREJUDGMENT INTEREST"
 {¶ 26} For the following reasons, we affirm the judgment of the trial court in part, *Page 9 
reverse it in part and remand this matter for further proceedings consistent with this opinion.
 II. The "Mary Carter Agreement" {¶ 27} In his first assignment of error, Korelitz argues that Jewish Hospital and Hodesh entered into a prejudicial Mary Carter agreement prior to the trial, and that the trial court erred in not revealing this agreement to the jury.
 {¶ 28} The term "Mary Carter agreement" arose from a Florida appellate case, Booth v. Mary Carter Paint Co. (Fla.App.1967), 202 So.2d. 8, overruled by Ward v. Ochoa (Fla. 1973), 284 So.2d 385. There, attorneys for the plaintiff and two of the three defendants entered into a confidential agreement, whereby the plaintiff agreed not to execute judgment against the settling defendants in exchange for the settling defendants' continued presence in trial and a guarantee that the plaintiff would receive at least $12, 500.00 despite the judgment. Id. at 10. On appeal, the non-settling defendant argued that the agreement was essentially a release from judgment, and that its liability for damages should have been offset by $12, 500.00, the amount of consideration paid by the settling defendants. Id. at 11. The court of appeals disagreed, finding the agreement to simply be an instrument limiting liability of the settling defendants and guaranteeing some return for the plaintiff. Id.
 {¶ 29} Over time, a Mary Carter agreement has come to designate a contract between a plaintiff and at least one defendant allying them against another defendant at trial. Vogel v. Wells (1991),57 Ohio St.3d 91, 93, 566 N.E.2d 154. "In effect, the `Mary Carter agreement' is apartial settlement of a dispute between a plaintiff and at least one of the defendants. The role of *Page 10 
the contracting defendant is comparable to that of the role of an actor in a real play. He is a favored party to the litigation as he hides behind his mask, thereby precluding the court, the jury, and the noncontracting defendant or defendants from recognizing what has conspiratorily transpired to their detriment. The contracting defendant or defendants are defendants in name only, since they, by `agreement, `actively promote the plaintiffs case. They may very well abandon or not even assert certain obvious defenses, such as contributory negligence, assumption of the risk, or even misuse of the product. They may readily admit the reasonableness of the damages claimed by the plaintiff. In either event, the `conduct' of the contracting defendant or defendants must influence the judge and jury, especially in those situations where the judge and jury are unaware of the executed `Mary Carter agreement.' Therefore, any recovery by the plaintiff is tainted because it also accrues to the benefit of the contracting defendant or defendants at the expense of the noncontracting defendant or defendants." (Emphasis sic.)Vermont Union School Dist. No. 21 v. H.P. Cummings Const. Co. (Vt. 1983),469 A.2d 742, 749, quoting Freedman, The Expected Demise of "Mary Carter": She Never Was Well (1975), 633 Ins.L.J. 602, 610.
 {¶ 30} The Ohio Supreme Court has established that Mary Carter agreements are generally characterized by three basic provisions: "`First, the settling defendant guarantees the plaintiff a minimum payment, regardless of the court's judgment. Second, the plaintiff agrees not to enforce the court's judgment against the settling defendant. Third, the settling defendant remains a party in the trial, but his exposure is reduced in proportion to any increase in the liability of his codefendants over an agreed amount. Some Mary Carter agreements include a fourth element: *Page 11 
that the agreement be kept secret between the settling parties.'"Vogel, 57 Ohio St.3d at 93, fn. 1, quoting Benedict, It's a Mistake to Tolerate the Mary Carter Agreement (1987), 87 Colum. L.Rev. 368, 369-70.
 {¶ 31} The importance in determining whether an instrument is a Mary Carter agreement lies in how the agreement is subsequently treated. Some jurisdictions have held that Mary Carter agreements are void as against public policy. See, e.g., Elbaor v. Smith (Tex. 1992), 845 S.W.2d 240,250 (Mary Carter agreements favor partial settlements that promote further litigation, skew the trial process, mislead the jury, promote unethical collusion among nominal adversaries, and create the likelihood that a less culpable defendant will be hit with the full judgment);Lum v. Stinnett (Nev. 1971), 488 P.2d 347, 351 (Mary Carter agreements promote maintenance and champerty, contravene legal ethics, and prejudice nonsettling defendants); and Trampe v. Wisconsin Tel. Co.
(Wis. 1934), 252 N.W. 675 (deliberately withholding information of the existence of the settlement imposes a fictitious suit upon the court that impedes the regular administration of justice and results in the trial of issues which are not real).
 {¶ 32} In contrast, a majority of jurisdictions have held that the agreements are valid but subject to disclosure to the parties, to the court, and to the jury. See, e.g., Sequoia Mfg. Co., Inc. v. HalecConst. Co. (Ariz.App. 1977), 570 P.2d 782, 792-95 (agreement must be disclosed to the court and remaining parties at the earliest opportunity; trial court has discretion to present the agreement to the jury); Firestone Tire Rubber Co. v. Little (Ark. 1982), 639 S.W.2d 726,728 (agreement must be disclosed to the nonagreeing party and may be admitted into evidence); Ratterree v. Bartlett (Kan. 1985),707 P.2d 1063, 1074-76 (agreement must be disclosed to the court, and the general terms of the financial interest of a settling defendant in the outcome of the *Page 12 
case should be disclosed to the jury); General Motors Corp. v.Lahocki (Md.App.1980), 410 A.2d 1039, 1046-47 (agreement must be disclosed to the court and opposing parties and admitted into evidence, unless there is danger of self-serving statements, in which case a statement of the terms of the settlement must be presented to the jury);Hegarty v. Campbell Soup Co. (Neb. 1983), 335 N.W.2d 758, 765 (agreement must be disclosed upon proper motion and admitted into evidence);Hatfield v. Continental Imports, Inc., (Pa. 1992), 610 A.2d 446, 451-52
(agreement or at least the existence of the reason for the potential bias must be conveyed to the jury); Poston by Poston v. Barnes
(S.C. 1987), 363 S.E.2d 888, 890 (agreement must be disclosed to the jury); Slusher v. Ospital by Ospital (Utah 1989), 777 P.2d 437, 444
(agreement must be disclosed to court and parties; then court should disclose the existence and basic contents of agreement to jury, which may include admission of the agreement into evidence).
 {¶ 33} Having considered the policies and law surrounding Mary Carter agreements, we are compelled to agree with the jurisdictions requiring that such agreements be subject to pretrial discovery and admitted into evidence, with some qualifications. See, e.g., Cox v. Kelsey-HayesCo. (Okla. 1978), 594 P.2d 354, 360 (finding that full disclosure of the agreement to the jury may prejudice the nonsettling defendant where the agreement contains self-serving statements of the plaintiff and settling defendant). "The reason for requiring disclosure of such agreements is manifest: the normal adversarial relationship between the plaintiff and defendants is distorted, if not destroyed, in instances where a purported defendant has an incentive to increase plaintiffs damages. Such distortion and incentive have the distinct potential for misleading jurors in reviewing evidence and judging witness credibility." Soria v.Sierra Pacific Airlines, Inc. (Idaho *Page 13 
1986), 726 P.2d 706, 716.
 {¶ 34} Here, Korelitz argues that the agreement entered into between Jewish Hospital and Hodesh is a Mary Carter agreement, evidenced most clearly by its built-in incentive for Jewish Hospital to facilitate an increase in Hodesh's damages by reducing Jewish Hospital's exposure to payment liability in proportion to an increase in liability of Korelitz. See Ziegler v. Wendel Poultry Services, Inc. (1993), 67 Ohio St.3d 10,16, 615 N.E.2d 1022, overruled by Fidelholtz v. Peller (1998),81 Ohio St.3d 197, 690 N.E.2d 502. Because the trial court did not examine the subject agreement before the matter proceeded to trial, we review the record in conjunction with Appellant's assignment of error de novo. Effectively, the trial court failed to exercise any discretion it may have had in determining the type of agreement at issue by refusing to examine the instrument until after the jury returned its verdict.
 {¶ 35} The agreement between Hodesh and Jewish Hospital called for the following: (1) if the jury returns a judgment for Hodesh against Jewish Hospital only, the hospital's payment is capped at $250, 000.00 regardless of the judgment amount; (2) if the jury returns a complete defense verdict, Jewish Hospital promises to pay Hodesh $175, 000.00; (3) if the jury returns a verdict for Hodesh against Korelitz only, Jewish Hospital promises that Hodesh will receive at least $175, 000.00, but that Jewish Hospital's maximum contribution in effectuating the judgment will be $250, 000.00 — any judgment over $250, 000.00 will relieve Jewish Hospital of any payment liability; (4) if Korelitz or his insurance carrier fails to pay the judgment amount within 30 days from the entry of judgment, Jewish Hospital will pay Hodesh $175, 000.00, and Hodesh *Page 14 
will dismiss Jewish Hospital from the case with prejudice; (5) if the jury returns a joint and several verdict, Jewish Hospital will pay one-half of the compensatory damages, but, again, Hodesh is guaranteed a payment of at least $175, 000.00, and Jewish Hospital's payment liability is capped at $250, 000.00; (6) if the jury returns an apportioned verdict against Jewish Hospital and Korelitz, Jewish promises to pay Hodesh no less than $175, 000, 00, including its apportioned share, but no more than $250, 000.00; (7) Jewish Hospital will match any settlement amount made with Korelitz, but no more than $250, 000.00; (8) Jewish Hospital will establish an escrow account to cover payments included within this agreement; (9) Hodesh will not assert a cause of action for punitive damages against Jewish Hospital; (10) Jewish Hospital will not contest that Hodesh suffered damages as a result of the surgical towel being left in his abdomen, but Jewish Hospital may contest whether it caused the damages and the extent of the damages; (11) Jewish Hospital will provide its employees, medical records and expert witness at trial, if requested; (12) the contingency agreement is not to be construed as an admission of liability or an impairment of the rights of the parties to proceed with their causes of action, nor is it to be construed as a settlement until the provisions have been exercised; (13) this agreement will remain confidential between Jewish Hospital and Hodesh — disclosure is prohibited without the express consent of the other party; and (14) Jewish Hospital will pay court costs with Korelitz, not independently.
 {¶ 36} Applying the factors set forth by the supreme court inVogel, we find that the agreement in the present case is a Mary Carter agreement. First, under the agreement, Jewish Hospital guaranteed Hodesh a minimum payment of $175, 000.00, regardless of the court's judgment. Next, Hodesh agreed not to enforce the court's judgment against Jewish Hospital-under no circumstances would Jewish Hospital be required to pay more than $250, 000.00. Third, *Page 15 
Jewish Hospital remained a defendant in the trial, but its exposure was reduced in proportion to an increase in the liability of Korelitz. This incentive is present in the clause providing that Hodesh would not look to Jewish Hospital for any payment in the event of a verdict against Korelitz for more than $250, 000.00. Finally, Jewish Hospital and Hodesh agreed to keep the terms of the agreement confidential. Only after Korelitz's counsel voiced his suspicion did counsel for Hodesh and Jewish Hospital acknowledge an agreement existed, but even then its terms were never disclosed until the jury returned with its verdict.
 {¶ 37} Next, presuming Mary Carter agreements are valid in Ohio, this Court must determine what requirements attach to the agreement in this matter with respect to disclosure.[1] At the very least, the trial court had a duty to examine the agreement before trial at the request of Korelitz's counsel. We fail to see any advantage in simply "sealing" the agreement and delaying any sort of examination, including whether the agreement could potentially influence the conduct of the parties, until the conclusion of the case. Rather, we find the appropriate procedure would have been to disclose the agreement to the court so that it could determine it was, in fact, a Mary Carter agreement. Thereafter, the agreement should have been entered into evidence to allow the *Page 16 
jury a candid opportunity to consider Jewish Hospital's interest in the outcome of the matter when judging the conduct of the parties and the credibility of their witnesses.
 {¶ 38} Korelitz further alleges that the record contains evidence of collusive conduct between Jewish Hospital and Hodesh. Specifically, he contends that (1) Hodesh and Jewish Hospital worked together to oppose Korelitz's pre-trial and post-trial motions; (2) the agreement prevented Jewish Hospital from contesting damages; (3) the agreement permitted Jewish Hospital to secretly provide hospital employees and medical records for the appellee's case; and (4) Hodesh and Jewish Hospital had a combined nine peremptory challenges.
 {¶ 39} The Supreme Court of Ohio has stated that "[o]ne of the major dangers of Mary Carter agreements lies in the distortion of the relationship between the settling defendant and the plaintiff, whichallows the settling defendant to remain nominally a defendant to theaction while secretly conspiring to aid the plaintiff's case" (Emphasis added.) Ziegler, 67 Ohio St.3d at 17. Moreover, Mary Carter agreements "pressure the `settling' defendant to alter the character of the suit by contributing discovery material, peremptory challenges, trial tactics, supportive witness examination, and jury influence to the plaintiffs cause." Elbaor, 845 S.W.2d at 249, citing Benedict, It's a Mistake to Tolerate the Mary Carter Agreement (1987), 87 Columbia L.Rev. 368, 372-73.
 {¶ 40} Although we do not find merit in all of the allegations Korelitz asserts, we do conclude that there exists some evidence of collusive activity in this case. First, Korelitz alleges that the hospital conspired with Hodesh to expose him to personal liability by opposing his pretrial motion to bifurcate — separating the issue of negligence from the issue of intentional misconduct. On one hand, including evidence of intentional misconduct within the primary *Page 17 
argument of medical negligence was one tactic to boost the argument that Korelitz was solely at fault. However, in light of the Mary Carter agreement and the incentive to increase Korelitz's liability over $250, 000.00, it is rational to construe Jewish Hospital's opposition to bifurcation as a means for elevating the damages. Indeed, with the presence of punitive damages, the potential for a jury award over $250, 000.00 is great.
 {¶ 41} We also are compelled to find some evidence of collusion in the way Jewish Hospital handled its peremptory challenges. Specifically, Korelitz questions whether the hospital was influenced by the agreement to excuse a prospective juror who, herself, had been a defendant in a recent personal injury action. That juror stated during voir dire that she felt targeted by the plaintiff in her case because the alleged pain and suffering sought appeared to be intertwined with the plaintiffs extensive medical history. She further provided that she could render a decision in favor of Jewish Hospital's nurses if the evidence demonstrated that they were not at fault. We find it inexplicable on its face why Jewish Hospital excused this juror, when she appeared inclined to challenge damages and weigh the evidence with a sympathetic ear toward the defendants. As before, it is reasonable to infer that the incentive to increase the damages above $250, 000.00 influenced the hospital's choice.
 {¶ 42} In conclusion, we agree that Korelitz was prejudiced by the trial court's decision not to disclose the terms of the Mary Carter agreement between Hodesh and Jewish Hospital to the jury. We find the instrument is valid and enforceable, but it should have been subject to pre-trial discovery and admissible into evidence. Doing so protects the integrity of the jury system, whose *Page 18 
role is to fairly resolve actual disputes between parties. When a Mary Carter agreement is present, as it was here, "a cloud of doubt remains over the proceedings because of the information withheld from the jurors." Hashem v. Les Stanford Oldsmobile, Inc.
(Mich.App.2005), 697 N.W.2d 558, 572. Accordingly, Korelitz's first assignment of error is sustained. The judgment of the trial court is reversed, and the matter is remanded for further proceedings consistent with this opinion.
 {¶ 43} Having sustained Appellant's first assignment of error, the remaining assignments of error are hereby rendered moot.
 III. Appeal by Intervenor Pro Assurance {¶ 44} Pro Assurance also filed a timely notice of appeal, assigning the following four errors related to the award of prejudgment interest:
 {¶ 45} I. "THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT IN FAILING TO DETERMINE THAT R.C. 1343.03(C) IS UNCONSTITUTIONAL."
 {¶ 46} II. "THE TRIAL COURT ABUSED ITS DISCRETION IN GRANTING PLAINTIFF-APPELLEE'S MOTION FOR PREJUDGMENT INTEREST."
 {¶ 47} III. "THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT IN FAILING TO APPLY BASIC RULES OF PROCEDURE AND EVIDENCE TO THE HEARING ON PREJUDGMENT INTEREST." *Page 19 
 {¶ 48} IV. "THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT IN INCORRECTLY CALCULATING ITS AWARD OF PREJUDGMENT INTEREST."
 {¶ 49} As we noted above, our decision to sustain Appellant Korelitz's first assignment of error rendered moot his other six assignments of error, including his challenge to the trial court's award of prejudgment interest. Likewise, our determination that the judgment against Korelitz must be reversed renders moot Pro Assurance's four assignments of error concerning the prejudgment interest award.
 {¶ 50} In order to provide some guidance on remand, however, and without resolving all of Pro Assurance's arguments, we briefly will address which version of the interest statute, R.C. 1343.03, applies in Hodesh's case. When Hodesh filed his lawsuit in 2002, R.C. 1343.03(C) read:
 {¶ 51} "Interest on a judgment, decree, or order for the payment of money rendered in a civil action based on tortious conduct and not settled by agreement of the parties, shall be computed from the date the cause of action accrued to the date on which the money is paid if, upon motion of any party to the action, the court determines at a hearing held subsequent to the verdict or decision in the action that the party required to pay the money failed to make a good faith effort to settle the case and that the party to whom the money is to be paid did not fail to make a good faith effort to settle the case." *Page 20 
 {¶ 52} An amended version of R.C. 1343.03 became effective on June 2, 2004, while Hodesh's lawsuit was pending. As amended, R.C. 1343.03(C) now provides:
 {¶ 53} "(1) If, upon motion of any party to a civil action that is based on tortious conduct, that has not been settled by agreement of the parties, and in which the court has rendered a judgment, decree, or order for the payment of money, the court determines at a hearing held subsequent to the verdict or decision in the action that the party required to pay the money failed to make a good faith effort to settle the case and that the party to whom the money is to be paid did not fail to make a good faith effort to settle the case, interest on the judgment, decree, or order shall be computed as follows:
 {¶ 54} "(a) In an action in which the party required to pay the money has admitted liability in a pleading, from the date the cause of action accrued to the date on which the order, judgment, or decree was rendered;
 {¶ 55} "(b) In an action in which the party required to pay the money engaged in the conduct resulting in liability with the deliberate purpose of causing harm to the party to whom the money is to be paid, from the date the cause of action accrued to the date on which the order, judgment, or decree was rendered;
 {¶ 56} "(c) In all other actions, for the longer of the following periods:
 {¶ 57} "(i) From the date on which the party to whom the money is to be paid gave the first notice described in division (C)(1)(c)(i) of this section to the date on which the judgment, order, *Page 21 
or decree was rendered. * * *
 {¶ 58} "(ii) From the date on which the party to whom the money is to be paid filed the pleading on which the judgment, decree, or order was based to the date on which the judgment, decree, or order was rendered.
 {¶ 59} "(2) No court shall award interest under division (C)(1) ofthis section on future damages, as defined in section 2323.56 of theRevised Code, that are found by the trier of fact." (Emphasis added).
 {¶ 60} A review of the foregoing language reveals that the amendments to R.C. 1343.03(C) potentially changed the accrual date for a prejudgment interest award and prohibited prejudgment interest on future damages. The trial court declined to apply the amended version of R.C. 1343.03(C). Pro Assurance argues that it erred in failing to do so. Although the amended statute took effect in 2004, well after Hodesh filed his lawsuit, Pro Assurance contends application of the amendments here is not retroactive because the jury verdict, the judgment, the motion for prejudgment interest, and the prejudgment interest hearing all post-dated the 2004 amendments. Therefore, Pro Assurance argues that applying the amendments in Hodesh's case would result in purely prospective application.
 {¶ 61} In support of its argument, Pro Assurance cites Barnes v. Univ.Hospitals of Cleveland, Cuyahoga App. Nos. 87247, 87285, 87710, 87903, 87946, 2006-Ohio-6266, appeal allowed, 114 Ohio St.3d 1409,2007-Ohio-2632, 867 N.E.2d 843.[2] In that case, the plaintiff *Page 22 
argued that the amended version of R.C. 1343.03(C) was inapplicable because her complaint was filed before the effective date of the amendments. The Eighth District disagreed, reasoning: "Although this statute was enacted after the suit was originally filed, it was in place before the prejudgment interest determination hearing was conducted, thus, it is applicable. The trial court's actions did not constitute a retroactive application because the current version of the statute was firmly in place before prejudgment interest was evaluated."
 {¶ 62} We note, however, that Pro Assurance has failed to mentionScibelli v. Pannunzio, Mahoning App. No. 05 MA 150, 2006-Ohio-5652. In that case, the Seventh District rejected the same argument advanced by Pro Assurance and adopted by the Eighth District in Barnes. Id. at ¶ 143. The Scibelli court found more persuasive the plaintiffs assertion "that since prejudgment interest started on the date the cause of action accrued, use of a statute different than the one existing on that date would constitute a retroactive application in a pending case." Id. at ¶ 141. Pro Assurance also has overlooked Conway v. Dravenstott, Crawford App. No. 3-07-05, 2007-Ohio-4933, which was decided shortly before Pro Assurance filed its reply brief. In Conway, the Third District followedScibelli and held that the pre-amendment version of R.C. 1343.03(C) applied, in an action pending on the effective date of the amendments, to determine the accrual date for prejudgment interest and whether prejudgment interest could be awarded on future damages. Id. at fn. 3 and ¶ 15.
 {¶ 63} Having reviewed Barnes, Scibelli, and Conway, we agree with the Seventh and Third will not affect Hodesh's case. *Page 23 
Districts. Under the pre-amendment version of the statute, prejudgment interest started on the date a cause of action accrued. When Hodesh's cause of action accrued, and when he filed his lawsuit, the pre-amendment version of the statute was in effect. Moreover, immediately after Hodesh filed his lawsuit, the parties' respective obligations to act in good faith were governed by the pre-amendment version of R.C. 1343.03(C). Therefore, we agree with Scibelli andConway that applying the post-amendment version of R.C. 1343.03(C) in Hodesh's case would constitute retroactive application.
 {¶ 64} Even if we are correct, however, Pro Assurance insists that retroactive application of the statute is appropriate. As Pro Assurance notes, an amended statute may be applied retroactively if (1) the legislature clearly expresses its intent to make the statute retroactive and (2) the statute is remedial in nature. State v. Consilio,114 Ohio St.3d 295, 298, 2007-Ohio-4163, 871 N.E.2d 1167, at ¶ 10. Pro Assurance argues that the first part of this test is satisfied because the amended statute expressly states that it "applies to actions pending on the effective date" of the amendment. With regard to the second part of the test, Pro Assurance cites several cases for the proposition that prejudgment interest is remedial in nature.
 {¶ 65} Upon review, Pro Assurance's argument fails to persuade us that the amended version of R.C. 1343.03(C) may be applied retroactively in Hodesh's case. To support its argument that the amendments were intended to be applied retroactively, Pro Assurance cites uncodified law in section three of 2004 H 212, which reads: "The interest rate providedfor in division (A) of section 1343. 03 of the Revised Code, as amendedby this act, applies to actions pending on the effective date of thisact. In the calculation of interest due under section 1343.03 *Page 24 
of the Revised Code, in actions pending on the effective date of this act, the interest rate provided for in section 1343.03 of the Revised Code prior to the amendment of that section by this act shall apply up to the effective date of this act, and the interest rate provided for in section 1343.03 of the Revised Code as amended by this act shall apply on and after that effective date." (Emphasis added).
 {¶ 66} As the Seventh District recognized in Scibelli, the foregoing language pertains exclusively to the interest-rate determination under division (A). It makes a new interest rate partially retroactive to pending actions. Scibelli, supra, at ¶ 146. The fact that 2004 H 212 expressly addresses the retroactivity of R.C. 1343.03(A), while failing to mention any retroactivity in R.C. 1343.03(C), supports Hodesh's position that R.C. 1343.03(C) does not have retroactive application to pending cases. Id. at ¶ 147; see, also, Conway, supra, at ¶ 15. Absent a clear indication that the legislature intended the amended version of R.C. 1343.03(C) to apply retroactively, it may be applied prospectively only. Scibelli, supra, at ¶ 143-44. Accordingly, we agree with the trial court that the pre-amendment version of the R.C. 1343.03(C) applies in Hodesh's case. As noted above, however, the amended version of R.C. 1343.03(A), which addresses the applicable interest rate, also applies because the legislature expressly made it applicable to pending cases. In any event, because we must reverse the trial court's entry of final judgment in favor of Hodesh, Pro Assurance's four assignments of error concerning prejudgment interest are overruled as moot.
 IV. Cross-appeal {¶ 67} Hodesh raises the following assignment of error on appeal: *Page 25 
 {¶ 68} "THE TRIAL COURT ERRED TO THE PREJUDICE OF MICHAEL HODESH WHEN IT GRANTED A DIRECTED VERDICT ON SPOLIATION OF EVIDENCE, FRAUD AND PUNITIVE DAMAGES."
 {¶ 69} Specifically, Hodesh contends that he set forth sufficient evidence of Korelitz's intentional misconduct and attempt to thwart liability, where (1) the surgeon procured an addendum to the radiologist's report of Hodesh's x-rays, providing that the "hazy density [in the x-ray] most likely represents a peculiar configuration of stool present in the right colon" (Tr. at 517.); (2) he discarded the surgical towel immediately after removing it from Hodesh's abdominal cavity; and (3) he misrepresented the towel in the post-operative report as a "fragment." For the following reasons, we find no merit in these arguments.
 {¶ 70} Civ. R. 50(A) governs the disposition of a motion for a directed verdict. Civ. R. 50(A)(4) provides:
 {¶ 71} "When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."
 {¶ 72} A review of a motion for a directed verdict necessitates an assessment of the legal sufficiency of the evidence presented at trial to take the case to the jury. Therefore, the question to be determined is one of law. Weisbrodt v. Stark Plumbing Co. (Jan. 6, 1993), Hamilton App. Nos. C-910572, C-910590, and C-910592, 1993 WL 4169, at *2. Under Civ. R. 50(A), an appellate court's standard for reviewing a motion for a directed verdict is de novo. In other *Page 26 
words, the reviewing court must ask "whether, after construing the evidence most strongly in favor of the nonmoving party, reasonable minds could come to but one conclusion and that conclusion is adverse to the nonmoving party." Id., citing Strother v. Hutchinson (1981),67 Ohio St.2d 282, 21 O.O.3d 177, 423 N.E.2d 467.
 {¶ 73} In the present matter, Hodesh disputes the trial court's decision to grant Korelitz's directed verdict pertaining to the plaintiffs claims of spoliation of the evidence/destruction of the evidence, fraud and punitive damages. First, the legal elements necessary to prove spoliation of evidence are "`* * * (1) pending or probable litigation involving the plaintiff, (2) knowledge on the part of defendant that litigation exists or is probable, (3) willful destruction of evidence by defendant designed to disrupt the plaintiffs case, (4) disruption of the plaintiffs case, and (5) damages proximately caused by the defendant's acts * * *.'" Thomas v. Cleveland ClinicFound., Cuyahoga App. No. 85276, 2005-Ohio-4564, quoting Smith v. HowardJohnson Co. (1993), 67 Ohio St.3d 28, 29, 615 N.E.2d 1037.
 {¶ 74} The premise of Hodesh's spoliation claim was that Korelitz intentionally destroyed the surgical towel after removing it from the plaintiffs abdomen in an effort to conceal evidence. While Hodesh did not present evidence demonstrating that Korelitz was aware of pending litigation in conjunction with the retained surgical towel, we may presume that he could predict a potential conflict to arise. Thus, we find the first two elements satisfied. However, Hodesh presented no evidence indicating Korelitz's action was willfully designed to disrupt the plaintiffs case. Here, Korelitz testified that he believed it wasn't necessary to send the towel to the pathology lab because there was no question that it was the origin of Hodesh's infection. *Page 27 
According to Korelitz, the main function of the pathology lab is to identify a particular object or, more commonly, to identify tissue. In this case, it was not necessary to identify the towel; instead, Korelitz sent a sample of the pus found on the towel in order to determine the bacteria causing the infection. This decision not to send the surgical towel to the pathology lab did not violate any standard of care, as opined by Korelitz's surgical expert, Stephan Myers, M.D. Furthermore, the evidence did not suggest that Korelitz violated any hospital policy in discarding the towel. Carolyn Davis testified that it was appropriate to not send the towel to the pathology lab because it was not a tissue specimen.
 {¶ 75} Likewise, there is no evidence demonstrating that Korelitz's decision to dispose of the towel disrupted Hodesh's case or caused any damage. The fact that the surgical towel was left inside of Hodesh's abdomen during the first surgery and caused a severe infection was never disputed. Moreover, we find that Hodesh has made no clear argument how there is more evidentiary value in submitting the actual towel to the jury than in presenting sworn testimony that the towel was recovered and confirmed to be the origin of the infection. Accordingly, we find that the trial court did not err in granting a directed verdict to Korelitz on the issue of spoliation of evidence.
 {¶ 76} Next, we find that the evidence was also insufficient to support Hodesh's fraud claim. In order to prevail on a claim of fraud, Hodesh was required to demonstrate all of the following elements at trial: "`(a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon *Page 28 
it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by reliance.'" Wiley v. GoodSamaritan, Hamilton App. Nos. C-0301301 and C-030181, 2004-Ohio-763, at ¶ 9, quoting Burr v. Stark Cty. Bd. of Commrs. (1986), 23 Ohio St.3d 69,23 OBR 200, 491 N.E.2d 1101, paragraph two of the syllabus.
 {¶ 77} Here, Hodesh asserts that Korelitz committed two fraudulent acts: (1) he altered the x-ray of Hodesh's abdomen to conceal that the source of the plaintiffs pain was the retained surgical towel; and (2) he mischaracterized the size of the towel in a post-operative report as a "fragment."
 {¶ 78} As we stated above, x-rays of Hodesh's abdomen prior to the second surgery showed a small bowel obstruction and evidence of a foreign body in the abdomen. The radiologist diagnosed these findings as "suspicious for intra-abdominal radiopaque foreign bodies possibly representing intra-abdominal towels or sponges." (Tr. at 518.) Korelitz thereafter reviewed the x-rays with the radiologist, comparing those with the films taken from the upper GI on January 18, 2001. Based on their review, the radiologist included an addendum to his report, which indicated that the "hazy density [in the x-ray] most likely represents a peculiar configuration of stool present in the right colon." (Tr. at 517.) At trial, Korelitz testified that the radiologist made his first diagnosis without the knowledge that an upper GI had already been performed on Hodesh, which would allow a comparison of the two films. Furthermore, the evidence showed that the towel was not a radiopaque foreign body clearly identified by an x-ray. Like before, Hodesh has not presented sufficient evidence which would lead us to conclude that the x-ray *Page 29 
report was a reckless attempt to conceal a material fact with the intent of misleading Hodesh. Instead, we find that the evidence demonstrates the addendum to the report was a reasonable alternate interpretation of the radiologist's diagnosis.
 {¶ 79} Nor do we find the misrepresentation of the surgical towel as a "fragment" to be an attempt by Korelitz to minimize his liability. At trial, no witness, including Korelitz, disputed that the entire towel was removed from Hodesh's abdomen. While we agree that the term does not create a precise picture of the size of the towel, there was no evidence that Korelitz intentionally sought to misrepresent it. In fact, he testified himself that it was a poor choice of words, where it was his intent to describe the towel as "compacted." (Tr. at 527.)
 {¶ 80} Furthermore, Hodesh has not proven that he justifiably relied upon the addendum to the x-ray report or the term "fragment" in the post-operative report for any particular purpose, or that he was injured on account of this reliance. At the most, Hodesh maintains he was angry with Korelitz for not discussing with him the details of the second surgery. However, the trial court found, as do we, that the evidence demonstrated Korelitz informed both Stuart Hodesh, the plaintiffs brother, and Bruce Greenberg, M.D., Hodesh's general practitioner, that a surgical towel had been found in the plaintiffs abdomen and it was the cause of the plaintiffs complications. Without proof of all six elements of fraud, Hodesh's argument must fail. Thus, we find the trial court did not err in directing a verdict for Korelitz on the issue of fraud.
 {¶ 81} Having concluded that neither the spoliation claim nor the fraud claim has merit, we *Page 30 
further disagree with Hodesh that the trial court erred in directing out his claim for punitive damages. According to the Supreme Court of Ohio, "[i]n a case involving medical malpractice where liability is determined and compensatory damages are awarded, punitive damages pled in connection with the claim for malpractice may be awarded upon a showing of `actual malice' * * * ." Moskovitz v. Mt. Sinai Med. Ctr. (1994),69 Ohio St.3d 638, 635 N.E.2d 331, paragraph one of the syllabus. Actual malice, defined within the context of awarding punitive damages, is "`(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.'" Id. at 652, quoting Preston v. Murty
(1987), 32 Ohio St.3d 334, 512 N.E.2d 1174.
 {¶ 82} In Moskovitz, the conduct giving rise to the claim for punitive damages was the deliberate alteration of medical records. There, the defendant-surgeon "whited-out" a typed entry in the medical record indicating that it was his decision to merely monitor a growth in the plaintiffs leg because he believed, at that time, the growth was benign. Id. at 643. A handwritten notation was inserted which provided that the patient-plaintiff refused a recommended biopsy and follow up work. Id. Thereafter, copies of the new record were distributed to different doctors and hospitals treating the plaintiff. Several months before she died of a malignant soft-tissue cancer that had originated from the growth in her leg, the plaintiff filed a complaint for discovery related to a potential medical malpractice claim. Id. at 640-41. During discovery, the original medical record was reconstructed, exposing the doctor's changes. In reviewing whether punitive damages were appropriately rewarded in this case, the supreme court found that such an intentional alteration of documents was "indicative of actual malice," *Page 31 
thereby rendering it necessary to submit the issue of punitive damages to the jury. Id. at 652. It further concluded that the doctor's "alteration of records exhibited a total disregard for the law and the rights of [the plaintiff] and her family," in that it was a blatant attempt by the doctor to exculpate himself for his medical negligence while placing the blame on the plaintiff. Id.
 {¶ 83} We find Moskovitz distinguishable from the case at bar. The evidence here does not point to a flagrant disregard for the law and the rights of the plaintiff. The decisions Korelitz made about interpreting the x-rays, discarding the towel, and representing it as a "fragment" in the post-operative report were clear examples of exercising his discretion as a surgeon. Moreover, the fact that an entire surgical towel was left in Hodesh's abdomen was never disputed; Korelitz himself admits this. Rather, the only issue in this case was whether Korelitz or the nurses or both were negligent in failing to remove the towel. This Court does not find that Hodesh produced evidence that demonstrates Korelitz's conduct rises to the level of actual malice warranting a reward of punitive damages. Accordingly, we find that the trial court did not err in granting Korelitz's motion for a directed verdict on the issues of spoliation of evidence, fraud and punitive damages. Hodesh's sole assignment of error is without merit and is hereby overruled.
 {¶ 84} The judgment of the trial court is affirmed in part, reversed in part, and the cause is remanded for further proceedings consistent with this decision. *Page 32 
Judgment affirmed in part, reversed in part, and remanded.
Wolff, J., and Fain, J., concur.
(Judges Wolff, Brogan, and Fain of the Second Appellate District sitting by assignment of the Chief Justice of the Supreme Court of Ohio.)
[1] The Supreme Court of Ohio did not determine that the agreements in either Vogel or Ziegler were Mary Carter agreements. Consequently, the court has yet to address the validity of such agreements in Ohio. InVogel, the court upheld the lower court's refusal to disclose an alleged Mary Carter agreement between the plaintiff and one defendant, where it found that an offer to limit the plaintiff's execution of the judgment against the "settling" defendant's property was gratuitous.57 Ohio St.3d at 94. According to the court, the likelihood for potential bias on the part of the settling defendant was minimal, and the record did not indicate any collusive conduct between the agreeing parties. Id. Likewise, in Ziegler, the supreme court concluded that the contested agreement was not a Mary Carter agreement because the amount of damages assessed against the nonsettling defendant had no impact on the amount the settling defendant would pay to the plaintiff, i.e., there was no built-in incentive on the settling defendant's part to increase the plaintiff's damages. 67 Ohio St.3d at 16-17.
[2] Although the Ohio Supreme Court granted an appeal inBarnes, the issues allowed on appeal do not include the retroactive application of R.C. 1343.03(C). Therefore, the outcome ofBarnes